******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ELGO, J., with whom D'AURIA, J., joins, dissenting. By importing into our statutory scheme an implied right for foster parents to seek permissive intervention, the majority today undermines and confuses the long established precedent holding that a foster parent has no right to family integrity relative to a foster child in his or her care. The state entrusts foster parents with the awesome power of caring for these children as wards of the state while working to achieve the permanency plan goals of the petitioner, the Commissioner of Children and Families. The majority's holding enables foster parents to use that position of trust to advance their own personal interests in the child, even when those interests contravene the permanency plan and reunification efforts in place for the foster child, despite no express authorization by our statutes.

It is axiomatic that statutes must be construed in a manner that comports with constitutional safeguards. Because the laws governing the litigation of child protection cases implicate the fundamental rights of both children and their parents, that precept is of utmost importance in construing the statutory scheme at issue in this appeal. In doing so, we must keep in mind that a child in foster care at all times is in temporary care. As this court is keenly aware, "[t]he well-known deleterious effects of prolonged temporary placement on the child . . . makes continuing review by [the Department of Children and Families (department)] of all temporary custody and commitment cases imperative. Where appropriate, the agency can and must take unilateral action either to reunite families or to terminate parental rights as expeditiously as possible to free neglected children for placement and adoption in stable family settings." *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 292, 455 A.2d 1313 (1983).

The department, as a guardian, is therefore charged with ensuring that the best available permanency option for a child is pursued, but it must do so ever mindful that it operates within the constraints of law, the inherently dynamic nature of a developing child, the ever changing and sometimes unforeseen circumstances in the lives of parents and children, and, most importantly, the fundamental liberty interest that a parent has in his or her child, which at times exists in tension with a child's best interest. When the petitioner must exercise the awesome power of the state by invoking the provisions of our General Statutes that authorize her to seek court remedies for a child in order to justify intrusion in the sanctity of a family, those constraints do not end simply because a court has adjudicated the child neglected. And while the best interest standard affords significant flexibility in fashioning remedies for a child, because of the degree to which it is recognized that children's needs will continue to grow, change and respond to his or her environment, including but not limited to the overarching goal for permanency and stability, it does not mean that a parent's rights to a child are eviscerated.

Moreover, foster parents are first and foremost state actors, entrusted by the department, as guardian for the child, to provide care for the child. In carrying out their statutory and regulatory obligations, foster parents are provided an inherent and necessary, but, nevertheless, inordinate amount of access to the child psychologically, emotionally, and physically. As a result, the department has an absolute duty and obligation to ensure that a foster parent walks the very same line that the department must carefully tread in attempting to secure the best and most appropriate permanency option—whether that is reunification, transfer of guardianship, or termination of parental rights—without infringing upon a parent's right to family integrity. That degree of control over foster parents,

as this court recognized in *Hunte* v. *Blumenthal*, 238 Conn. 146, 680 A.2d 1231 (1996), not only serves the children, who are the wards of the state, but also ensures that the department does not unduly infringe upon the rights of biological parents. See id., 156–57.

The majority concludes that, in enacting and amending General Statutes § 46b-129, the legislature "did not intend . . . to prohibit a trial court from granting permissive intervention to a foster parent when appropriate." Page    of the majority opinion. I respectfully disagree. Biological parents possess a fundamental constitutional right to family integrity. The rights of foster parents by contrast are rooted in—and strictly limited by—statute.[1] Accordingly, this court has recognized that "[f]oster parents do not enjoy a liberty interest in the 'integrity of their family unit.' " *Hunte* v. *Blumenthal*, supra, 238 Conn. 164.

With respect to the statute at issue in this appeal, which pertains to participation in child neglect proceedings, the legislature has carefully crafted a detailed statutory scheme that protects neglected and uncared for children while also "enhancing the parental capacity for good [childcare]" and, at the same time, "provid[ing] a temporary or permanent nurturing and safe environment for children when necessary . . . ." (Internal quotation marks omitted.) *In re Juvenile Appeal (85-BC)*, 195 Conn. 344, 352, 488 A.2d 790 (1985). Within that scheme, the legislature has specifically addressed the roles that both relative and nonrelative foster parents play in juvenile court proceedings. The legislature has vested "[a]ny person related to a child or youth" with the right to seek to intervene in a neglect petition "for purposes of seeking guardianship . . . ." General Stat-

---

[1] For purposes of this opinion, the phrase "biological parent" refers to both a biological parent and an adoptive parent. See General Statutes § 46b-471 (1) and (6).

utes § 46b-129 (d) (4). The legislature has not, however, vested a right to intervene in a nonrelative foster parent. Rather, the legislature explicitly conferred on nonrelative foster parents "the right to be heard" in "any proceeding" related to a foster child under § 46b-129. General Statutes § 46b-129 (p). In so limiting a nonrelative foster parent's participation in child neglect proceedings, the statutory scheme properly safeguards a biological parent's fundamental right to family integrity and also avoids the inherent and often inordinate delay attendant to adding additional, unnecessary parties to neglect proceedings, as this case exemplifies. Because I believe that this court should defer to the legislature's decision to not extend the ability to intervene in neglect proceedings to foster parents, I respectfully dissent.

## I

The following relevant facts are reflected in the record before us and are not in dispute. Approximately seven months after the minor child, Jewelyette M., was adjudicated neglected, the petitioner placed her in the care of the nonrelative foster parents Diana N. and John N. (foster parents), who are licensed by the department. See General Statutes § 17a-114. The foster parents were planning to adopt Jewelyette in accordance with the approved permanency plan, which, at that time, sought to terminate the parental rights of the respondent father, John M. (respondent).[2] After this case suffered through delays due to the COVID-19 pandemic, the petitioner changed course and sought to reunify Jewelyette and the respondent. As the record reflects, the department at that time was in receipt of a psychological evaluation report, prepared in 2019 by Stephen Humphrey, a clinical psychologist. In that report, Humphrey expressed "ambivalence about what to recommend in terms of reunification."

---

[2] The respondent mother's parental rights previously were terminated in 2017. As the majority notes, the respondent father died on January 21, 2025.

Humphrey opined that the decision was an "exceptionally difficult matter, as [the respondent] appeared to have largely rehabilitated as measured by his engagement in treatment, and apparent cessation of problems with substances and criminal behavior. Further, he had established a residence and was employed." In his report, Humphrey recounted how, in 2017, the respondent exhibited a "remarkable lack of understanding of what will likely be required of him to maintain sobriety."[3] In 2019, however, Humphrey found it notable that the respondent "had largely complied not only with recommended services, but that there appeared to have been a substantial change in his engagement in antisocial behaviors. Despite his lengthy criminal record, there had not been any apparent criminal recidivism. Further, he was employed and had started his own business. He had attended treatment and appeared to have benefitted. He reported attending twelve-step meetings."[4] Indeed, although various psychiatric diagnoses were ascribed or contemplated over time to the respondent, by 2019, Humphrey "opined that none of these were supported by his presentation, history, or testing." He also noted how the respondent's treatment providers and parole officer "did not identify significant concerns about his engagement, cooperation, or progress in any services. . . . He had rehabilitated to an

---

[3] "[Humphrey's] primary concern during the 2017 evaluation was [the respondent's] extensive history of antisocial behavior." In 2019, however, he stated that the respondent's behavior "[was] not explained solely by substance abuse." (Emphasis omitted.) It is evident, however, that the respondent's diagnosis of antisocial behavior was retained on the basis of the respondent's history, as there are no reports that he engaged in any such behaviors since being released from prison.

[4] Humphrey additionally opined in his report that a "continuing involvement in a lifestyle geared toward sobriety, including attending meetings, would greatly increase the prognosis for [the respondent] remaining sober and maintaining a grounded, rational approach to addiction-related matters." The respondent "appeared to have genuinely gained an understanding of why he would benefit from staying sober, and more importantly, how he might do so."

extent [that Humphrey had] deemed unlikely as of January, 2018.''[5]

Humphrey also noted the close relationship between Jewelyette and the respondent, as his ''impression of Jewelyette's interaction with her father was that she knew him, trusted him, and enjoyed spending time with him. She referred to him as 'Daddy,' and thus appears to identify two men, psychologically, as 'Daddy' . . . .'' Humphrey further stated that he ''found it especially difficult to be in the role of [decision maker],'' particularly because Humphrey ''believed Jewelyette would be adequately cared for by either her father or her current caretakers . . . .'' Indeed, he opined that the respondent ''presented at that time as capable of occupying a responsible position in Jewelyette's life.'' This was in light of the respondent's openness to receiving guidance regarding how to communicate with Jewelyette if she were to reunify at that time and if she wanted contact with her foster family, given his understanding that Jewelyette had a ''close bond and connection with her present caretakers . . . .''[6]

Humphrey ultimately did not recommend reunification in 2019, due largely to the ''psychological difficulty

[5] During this period, the respondent was also engaged in individual psychotherapy with Blerim Rexhaj, a licensed professional counselor, for an extended period. Rexhaj stated that the respondent had engaged in the recommended cognitive behavioral therapy and that he had been '' 'working hard' '' and had made '' 'significant progress.' '' Rexhaj noted that he ''did not see any concerns and there were 'no outstanding goals [the respondent] has not met.' '' As Humphrey notes in his report, ''[t]hese opinions were echoed by other treatment providers.''

[6] Humphrey noted that the respondent had claimed ''he was told [that] he would be receiving parenting coaching, and reiterated that he expected to learn how to talk to Jewelyette if they reunited and she wanted to see her foster mother or foster sister.'' He recounted that the respondent ''stated 'he wanted family therapy with Jewelyette' because if she wanted to see her foster mother, he would 'not have a problem' with them communicating through Facebook or 'setting up a play date' with the other girl in her present home.''

Jewelyette would likely face at losing her relationship with the [foster] family . . . ." Although Humphrey did not recommend reunification at that time, he nevertheless stated, "[i]n my opinion, [the respondent] presents at this time as capable of occupying a responsible position in Jewelyette's life." That backdrop provides necessary context for the department's subsequent decision to change course and seek to reunify Jewelyette and the respondent.[7] In my view, the petitioner's decision to seek approval of a permanency plan that called for reunification in September, 2020, was reasonable, prudent, and in accordance with its statutory obligations. At that point, the child had been placed with the foster family for almost three years and just had turned five. The trial court, *C. Taylor*, *J.*, nevertheless sustained the objection, which was advanced by Jewelyette's attorney, to that proposed permanency plan on March 15, 2021.

Around that time, which was four years ago, the foster parents began to challenge the petitioner's stated goal of reunification. After they were informed on November 1, 2021, that "the psychological evaluation [report] recommends reunification"[8] and that a hearing had been scheduled on whether to revoke Jewelyette's commitment to the petitioner, the foster parents sought to

---

[7] It can hardly be disputed that an objectionably reasonable assessment would indicate that the petitioner's hurdle in prevailing on a termination of parental rights petition—with its clear and convincing burden of proof with respect to the adjudicatory grounds of failure to rehabilitate—would have been exceedingly high, if not insurmountable, particularly in light of Humphrey's observations of the warm and positive interactions between the respondent and Jewelyette in 2017 and 2019.

[8] In his report, Humphrey opined that, "if all of the adults involved were capable of placing Jewelyette's interests first, [then] they would seek to allow her father to take on the role of being her primary parent, but preserve the role of her foster family as extremely important people in her life. This would allow a broad network of support that, ideally, would remove the tension between the results and replace it with a plan to provide the enriching and empathetic environment for Jewelyette."

intervene in the neglect proceedings. On November 8, 2021, the foster parents filed a motion to intervene "as a matter of right and at the court's discretion," citing as authority *Horton* v. *Meskill*, 187 Conn. 187, 445 A.2d 579 (1982), and Practice Book § 35a-4.[9] They sought intervention for the purposes of "presenting evidence, including cross-examination of witnesses, and argument regarding the best interests of the child in relation to the pending motion to revoke commitment and the motion to review the permanency plan."

With respect to the merits of their motion to intervene, the foster parents asserted "a direct and immediate interest" in "family integrity" with Jewelyette on the ground that she had been in their care for years, attempting to distinguish the Appellate Court's decision in *In re Joshua S.*, 127 Conn. App. 723, 14 A.3d 1076 (2011), which held that the "limited and narrow set of rights" provided to foster parents did not include "intervention as a matter of right . . . ." Id., 730. The foster parents in the present case argued that, unlike in *In re Joshua S.*, they "are preadoptive foster parents and received an adoption disclosure form at the time of placement" and "[t]he matter has been scheduled for [termination of parental rights] trials on more than

---

[9] As this court has explained, "[i]t is well settled by statutory . . . and decisional law . . . that the courts do not have the authority to enact rules governing substantive rights and remedies. Certainly, where a statute creates a substantive right, a conflicting practice book rule cannot stand." (Citations omitted; footnote omitted.) *Mitchell* v. *Mitchell*, 194 Conn. 312, 324, 481 A.2d 31 (1984); see also *In re Samantha C.*, 268 Conn. 614, 639, 847 A.2d 883 (2004) ("we are obliged to interpret [the rules of practice] so as not to create a new right, but rather to delineate whatever rights may have existed, statutorily or otherwise, at the time of the proceedings underlying the present appeal" (emphasis omitted)). Because § 46b-129 (p) specifically sets forth the substantive right of nonrelative foster parents to notice and to be heard in child protection proceedings, I do not believe that our courts may alter or expand that statutory right. For that reason, I confine my analysis to the question of statutory interpretation presented in this appeal. See also footnote 17 of this opinion.

one occasion and [has been] repeatedly delayed. . . . [T]he interests of the foster parents in the right to family integrity are clearly different than those presented in *In re Joshua* [*S*]. Under these facts, the foster parents have a direct and substantial interest in protecting the integrity of *their* family, which includes Jewelyette."[10] (Emphasis added.)

The foster parents further argued that intervention was necessary to allow them an opportunity to contest both the petitioner's and the respondent's assertions that they had "interfered with reunification." They specifically contended that the question of interference "has become intertwined" with the child's best interest. They denied the allegations of interference and contended that "[n]o other party can meaningfully respond to such accusations [or] present evidence regarding the actions of the foster parents." Moreover, the foster parents argued that intervention was necessary because a finding that they had interfered with reunification "may impact their ability to foster and adopt other children" going forward. Finally, they represented that their motion was timely and that intervention "will neither delay the proceedings nor prejudice other parties." Judge Taylor granted the foster parents' motion to intervene on January 20, 2022.

Following a trial on the respondent's motion to revoke, which concluded on January 19, 2023—more than fourteen months after the foster parents sought intervention—Judge Taylor denied the respondent's motion to revoke commitment in a decision issued on May 15, 2023. Two months later, on July 20, 2023, the Appellate Court officially released its decision in *In re Ryan C.*, 220 Conn. App. 507, 299 A.3d 308, cert. denied,

_____

[10] In their motion to intervene, the foster parents neither acknowledged nor attempted to distinguish the precedent of this court in *Hunte* v. *Blumenthal*, supra, 238 Conn. 164, in which this court held that "[f]oster parents do not enjoy a liberty interest in the 'integrity of their family unit.'"

348 Conn. 901, 300 A.3d 1166 (2023), in which the court construed § 46b-129 and held that nonrelative foster parents lack standing to intervene in the dispositional phase of a neglect petition. Id., 526–27. Relying on that precedent, the petitioner promptly moved to remove the foster parents as intervenors in the present case on July 21, 2023. Nearly five months later, on December 11, 2023, Judge Taylor granted that motion and removed the foster parents as parties. From that judgment, the foster parents appealed, arguing that *In re Ryan C.* should be overruled because the Appellate Court misinterpreted § 46b-129 (p).

While that appeal was pending, on November 4, 2024, the trial court, *Daniels, J.*, granted the petitioner's motion to open and to modify the disposition of the underlying petition so as to return Jewelyette to the custody of the respondent under a period of protective supervision that was scheduled to terminate in May, 2025. The foster parents thereafter filed a writ of error challenging the November 4, 2024 decision to return Jewelyette to the respondent's custody, claiming that Judge Daniels violated their "right to be heard" under § 46b-129 (p) because they were only permitted to give a statement through their attorney at the outset of that proceeding. Oral argument before this court[11] on both the foster parents' appeal and writ of error was held on December 19, 2024.

On January 22, 2025, the foster parents moved to stay the November 4, 2024 dispositional order and to preclude the trial court from terminating the period of protective supervision during an in-court review that had been scheduled for February 3, 2025. They implied that, if this court did not issue a stay and the period of protective supervision was terminated, then these

---

[11] These matters were originally filed in the Appellate Court, and this court transferred them to itself pursuant to General Statutes § 51-199 (c).

appellate matters would be rendered moot. Two days later, the petitioner filed a motion to dismiss the appeal, in which it informed this court that the respondent had died on January 21, 2025, and that, on January 23, 2025, Judge Daniels had transferred guardianship of Jewelyette to her paternal aunt on an interim basis "pending a full hearing." On February 6, 2025, this court granted the foster parents' motion in part and "stayed [further proceedings] until further order of this court."[12] Jewelyette therefore remains in the custody of a relative, whom the department has investigated and approved for placement, while the foster parents' appeal and writ of error remain pending before this court. In subsequent hearings before this court, the child's attorney represented that the child was adamant about remaining in the care of the respondent while the child's therapist has recommended monthly visitation with the foster parents and only if Jewelyette is willing to do so.

The principal question presented in this appeal concerns the extent of the rights conferred on nonrelative foster parents by the legislature in § 46b-129. That question involves an issue of statutory interpretation, over which our review is plenary. See *Scholastic Book Clubs, Inc.* v. *Commissioner of Revenue Services*, 304 Conn. 204, 213, 38 A.3d 1183, cert. denied, 568 U.S. 940, 133 S. Ct. 425, 184 L. Ed. 2d 255 (2012). "When construing a statute, [o]ur fundamental objective is to ascertain

---

[12] On that same day, a majority of this court denied the petitioner's motion to dismiss. For the reasons set forth in Justice D'Auria's dissenting opinion, I would have granted the motion to dismiss and "let the trial court move forward with its consideration of the best course of action" as "the relief sought by the foster parents [in this appeal and writ of error] was no longer viable . . . ." Page    and footnote 4 of Justice D'Auria's dissenting opinion. Nonetheless, because I believe that the opinion articulated by the majority today sets a precedent with profound and damaging consequences for children and families in our child protection courts, I am compelled to write separately. See *State* v. *McCoy*, 331 Conn. 561, 587, 206 A.3d 725 (2019) ("we are mindful of the old adage that bad facts make bad law").

and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." (Internal quotation marks omitted.) *Seramonte Associates, LLC* v. *Hamden*, 345 Conn. 76, 83, 282 A.3d 1253 (2022). "In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Gilmore* v. *Pawn King, Inc.*, 313 Conn. 535, 542–43, 98 A.3d 808 (2014).

In construing the statutory rights of nonrelative foster parents, this court does not write on a blank slate. For that reason, in part II of this opinion, I review the fundamental substantive due process rights that biological parents have in family integrity, which arise naturally from the parent-child relationship, and the precedent of this court holding that foster parents have only those rights that "are defined . . . by statute" such that "[f]oster families do not have the same rights as biological families or adoptive families." (Internal quotation marks omitted.) *Hunte* v. *Blumenthal*, supra, 238 Conn. 164.

In part III of this opinion, I discuss the unacceptable, yet inevitable, consequences that will flow from the

majority's holding that the trial court has the authority to entertain motions for permissive intervention by nonrelative foster parents. The effect of allowing permissive intervention by nonrelative foster parents is incompatible with their limited, albeit enormously important, role in the child protection system. I contend, as the record in the present case clearly demonstrates, that permissive intervention by nonrelative foster parents clashes with the department's statutory obligation to work toward reunification while assuring that the child's physical, social, educational, and emotional needs are met, including their need for a permanency plan that is effectuated as safely, appropriately, and expeditiously as possible, consistent with the child's best interest. See General Statutes §§ 17a-112 (j) (1) and 46b-129 (k) (4) (D). In part III of this opinion, I also explain why permissive intervention of a nonrelative foster parent is unnecessary and ill-advised because that foster parent is obligated to support the department's reunification efforts as well as the petitioner's permanency plan goals. In other words, a foster parent cannot properly intervene as a party with an interest distinct from the department because, as creatures of statute, a foster parent's interest, to the extent that it is purportedly aligned with the child's best interest, is already represented more than adequately by either the petitioner, the attorney for the minor child (AMC), or the guardian ad litem (GAL).[13]

The most significant consequence of allowing nonrelative intervention in a neglect proceeding is the enormous risk that biological parents will impermissibly be

---

[13] If a foster parent seeks to present information to the juvenile court that the department does not see fit to advance, then the AMC and the GAL have the obligation to assess and to advocate for the child's wishes and the child's best interest, respectively. If the foster parents' position is deemed meritorious by the AMC and is either consonant with the child's wishes or best interest, the AMC also has an independent duty to advise and advocate, as appropriate, obviating the need for nonrelative foster parent intervention.

compared to the intervening nonrelative foster parents. That impingement on a biological parent's constitutional rights, in turn, necessarily taints a trial court's best interest analysis. Furthermore, the consequences of allowing nonrelative foster parent intervention will also reverberate within the termination of parental rights context. Because the majority's holding effectively authorizes foster parents to wield a legally sanctioned wedge in the relationship between a biological parent and his or her child, the viability of any subsequent attempt to seek a termination of a parent's rights, should reunification fail, will be significantly compromised and the permanency options available for the child will be limited, as the juvenile court is statutorily obligated to take into account whether a person has unreasonably prevented the biological parent from having a relationship with his or her child. See General Statutes § 17a-112 (k) (court "shall consider and shall make written findings regarding . . . (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the . . . unreasonable act of any other person"). A biological parent who asserts a defense based on that provision, most vividly exemplified by the record in this case, would have a compelling case that may well prevail. This is especially so if there is any viable claim that a foster parent has attempted to alienate a child from his or her biological parent, as the facts of this case suggest.

I also believe that the intervention of nonrelative foster parents will inevitably lead to unnecessary and unacceptable delays in permanency for the child in question as well as for children in the system in general, which is "inconsistent" with a child's best interest. *In re Davonta V.*, 285 Conn. 483, 494, 940 A.2d 733 (2008). The course of the litigation will be extended, including on appeal, as Justice D'Auria powerfully explicates in his dissenting opinion, because the majority's holding

enables the trial court, in its discretion, to permit an intervening foster parent to call their own witnesses, cross-examine other parties' witnesses, and introduce evidence, which will each consume time on the trial court's docket. An intervening foster parent also can file motions, as the foster parents did here, to pursue remedies like injunctions and discovery with respect to the respondent's treatment records, as well as confidential files from the department. Moreover, a foster parent's "right" to litigate the quality and propriety of their care relative to children entrusted to them by the department must, in the first instance, be litigated in the proper forum—an administrative hearing—which is not only the more appropriate venue, but also does not risk unconstitutionally tainting dispositional proceedings before the court over the course of the child's temporary care and guardianship with the department. All of the foregoing supports the legislature's decision to promulgate a statutory scheme that does not provide for the intervention of nonrelative foster parents in neglect petitions and, instead, wisely limits a nonrelative foster parent's role in neglect proceedings to the right to be heard and comment as to the child's best interest under § 46b-129 (p). In my view, principles of separation of powers and judicial restraint compel this court to defer to that legislative prerogative.

In the fourth and final part of this opinion, I interpret what the legislature has specifically conferred on nonrelative foster parents in § 46b-129, which plainly provides them with the "right to be heard" under the unambiguous language of § 46b-129 (p). A foster parent's right to be heard is fundamentally distinct from the right to intervene, which the legislature separately accounted for and specifically addressed in subsection (d) of § 46b-129. Because this court construes statutes so as to comply, rather than conflict, with applicable constitutional requirements; see *In re Valerie D.*, 223

Conn. 492, 534–35, 613 A.2d 748 (1992); I would conclude that, in enacting and later amending § 46b-129 in 2001; see Public Acts 2001, No. 01-142, § 8; the legislature sought to assure that foster parents are provided an opportunity to have a voice in dispositional hearings—but nothing more. Unless and until the court makes a finding that reunification efforts are no longer warranted,[14] a construction that permits any other reading both structurally and impermissibly stacks the odds against a respondent parent and compromises the duty of the department to pursue permanency options for the child.

In light of the foregoing, I would not overrule *In re Ryan C.* and would conclude that permissive intervention is not available to nonrelative foster parents in neglect proceedings. I therefore would affirm the December 11, 2023 order of the trial court removing the foster parents as parties. In addition, I would deny the foster parents' writ of error, as the record unequivocally indicates that they were not denied their "right to be heard and comment" on November 4, 2024, when Judge Daniels granted the petitioner's motion to open and modify the disposition of the neglect petition. General Statutes § 46b-129 (p). Accordingly, I respectfully dissent.

II

In ascertaining the proper meaning of § 46b-129, we do not write on a blank slate but, rather, must be guided by prior decisions of this court and the United States Supreme Court. I respectfully submit that the majority's holding today will have the impact of improperly

---

[14] See General Statutes § 17a-111b (b) (petitioner "or any other party may, at any time, file a motion with the court for a determination that reasonable efforts to reunify the parent with the child are not required"); see also General Statutes § 46b-129 (k) (4) (at hearing on permanency plan, "the court shall . . . (E) determine the services to be provided to the parent if the court approves a permanency plan of reunification and the timetable for such services").

interfering with a biological parent's fundamental constitutional right to family integrity, in contravention of decades of precedent that had insulated a biological parent's right to family integrity from impermissible considerations and comparison by strictly construing the role that foster parents are permitted to play in dispositional proceedings. The majority opinion wholly ignores a biological parent's substantive due process right to family integrity, which "encompasses the reciprocal rights of both parent and children . . . the interest of the parent in the companionship, care, custody and management of his or her children . . . and of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association . . . with the parent . . . ." (Internal quotation marks omitted.) *In re Zakai F.*, 336 Conn. 272, 291, 255 A.3d 767 (2020); see also *Troxel* v. *Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) ("the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court"); *In re Teagan K.-O.*, 335 Conn. 745, 755, 242 A.3d 59 (2020) ("[a] constellation of constitutional . . . rights serve to protect the integrity of the family unit [and] the parent-child relationship"); *In re Jacob W.*, 330 Conn. 744, 756, 200 A.3d 1091 (2019) ("the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection" (internal quotation marks omitted)); *Nye* v. *Marcus*, 198 Conn. 138, 144, 502 A.2d 869 (1985) ("[b]iological and adoptive families have a liberty interest in the integrity of their family unit which is part of the fourteenth amendment's right to familial privacy").

As this court has explained, "the right to family integrity . . . encompasses the reciprocal rights of both

[the] parents and [the] children . . . the interest of the parent in the companionship, care, custody and management of his or her children . . . and of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association . . . with the parent . . . ." (Internal quotation marks omitted.) *In re Zakai F.*, supra, 336 Conn. 316 (*Mullins, J.*, concurring in part and dissenting in part). "In other words, parents and children share a compelling interest in remaining together as a family unit. See, e.g., *In re Christina M.*, 280 Conn. 474, 486–87, 908 A.2d 1073 (2006) ([i]n cases involving parental rights, the rights of the child coexist and are intertwined with those of the parent . . . ); see also, e.g., *Santosky* v. *Kramer* [455 U.S. 745, 760, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)] . . . . It is well established that the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court. . . . The rights to conceive and to raise one's children have been deemed essential . . . basic civil rights of man . . . and [r]ights far more precious . . . than property rights . . . . It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. . . . The integrity of the family unit has found protection in the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment . . . and the [n]inth [a]mendment [to the United States constitution] . . . ." (Citation omitted; internal quotation marks omitted.) *In re Zakai F.*, supra, 291–92.

A biological parent's fundamental right to family integrity has been expressly affirmed by the United States Supreme Court, which stated that "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the [d]ue [p]rocess

[c]lause of the [f]ourteenth [a]mendment." *Cleveland Board of Education* v. *LaFleur*, 414 U.S. 632, 639–40, 94 S. Ct. 791, 39 L. Ed. 2d 52 (1974); see *Smith* v. *Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 845, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977) ("unlike the property interests that are also protected by the [f]ourteenth [a]mendment . . . the liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights" (citation omitted; footnote omitted)). Indeed, "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child . . . . [P]arents retain a vital interest in preventing the irretrievable destruction of their family life." (Internal quotation marks omitted.) *In re James O.*, 160 Conn. App. 506, 516, 127 A.3d 375 (2015), aff'd, 322 Conn. 636, 142 A.3d 1147 (2016).

Foster parents stand in stark contrast to biological parents, as they are creatures of statute. Their rights and obligations are strictly "defined and restricted by statute." *Hunte* v. *Blumenthal*, supra, 238 Conn. 164; see *In re Juvenile Appeal (Docket No. 10718)*, 188 Conn. 259, 262, 449 A.2d 165 (1982) (foster parents have statutory standing "in any proceeding concerning the placement or revocation of commitment of a foster child . . . this standing does not spill over into a proceeding involving termination of parental rights" under different chapter of General Statutes (citation omitted; footnote omitted)); see also *Smith* v. *Organization of Foster Families for Equality & Reform*, supra, 431 U.S. 845 ("[f]irst, unlike the earlier cases recognizing a right to family privacy, the [s]tate here seeks to interfere, not with a relationship having its origins entirely apart from the power of the [s]tate, but rather with a foster family which has its source in state law and contractual

arrangements"). It is well established that "[f]oster families do not have the same rights as biological families or adoptive families," and foster parents always must be conscious of the fact that their "expectations and entitlements . . . can be limited by the state." (Internal quotation marks omitted.) *Hunte* v. *Blumenthal*, supra, 164. No one questions the proposition that foster parents play a vital role in the lives of these children, but it cannot be overlooked that foster parents are "entrusted with foster children on a temporary basis only" and are "warn[ed] *against* [cultivating] any deep emotional involvement with the child . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 164–65, quoting J. Goldstein et al., Beyond the Best Interests of the Child (1979) p. 24.[15]

Consequently, unlike biological parents, foster parents are required to be licensed by the department and are subject to a slew of regulatory oversight. See General Statutes § 17a-145 (a) ("[n]o person or entity shall care for or board a child without a license obtained from the [petitioner]"); see generally Regs., Conn. State Agencies § 17a-145-130 et seq. This court has directed that "[t]he fountainhead of the state's right to control foster parents is the statutory scheme requiring the department to guarantee the welfare of foster children."

---

[15] I respectfully suggest that a foster parent who can provide a deeply loving and caring environment in which a child feels loved, secure, and safe while, at the same time, respecting a biological parent's fundamental right to seek reunification and the child's legal right to family integrity, represents the highest standard of foster parenting. See, e.g., *In re Victor D.*, Superior Court, judicial district of Middlesex, Docket No. CP-100007160-A (November 7, 2014) (foster parents' training and experience include awareness of difficulty for children and support for biological parents in transitioning children for visits), aff'd, 161 Conn. App. 604, 128 A.3d 608 (2015). To the extent that any "deep emotional involvement§ morphs into an improper sense of entitlement, as represented by a foster parent's claim of family integrity with respect to the child of a biological parent whose rights have not been terminated, Goldstein's warning against foster parents so entangling themselves is still meaningful and warranted. J. Goldstein et al., supra, p. 24.

*Hunte* v. *Blumenthal*, supra, 238 Conn. 155. In further-
ance of that scheme, the legislature has authorized the
petitioner to promulgate regulations governing foster
parents. See General Statutes § 17a-90 (c) ("[petitioner]
shall adopt such procedures as the [petitioner] may
find necessary and proper to assure the adequate care,
health and safety of children under the [petitioner's]
care and general supervision"). Those regulations con-
trol the conduct of foster parents, as state actors, by
placing limits and requirements on various aspects of
foster care, including a foster parent's home and what
is acceptable as the child's bedroom. Regs., Conn. State
Agencies §§ 17a-145-137 and 17a-145-139; see also
*Hunte* v. *Blumenthal*, supra, 166 (concluding that
"department ha[s] the right to control foster parents"
for purposes of determining whether foster parents are
entitled to statutory immunity as "employees" of
department).

Significantly, and particularly relevant to the present
appeal, is the fact that foster parents are obligated, at
all times, to support the petitioner's goals or, at least,
not to act in contravention of them, regardless of
whether those goals include a role for the foster parents.
The department's regulations require in relevant part
that a foster parent "*shall comply with the treatment
plan for the child and work cooperatively with the
department* . . . in all matters pertaining to the child's
welfare. . . . Foster parents shall accept, cooperate
with and support arrangements made for the child to
have contact including visits and correspondence with
the child's biological family in keeping with the fre-
quency indicated by the treatment plan. . . . Foster
parents *shall be active participants in reunification of
the child with the child's biological family*." (Emphasis
added.) Regs., Conn. State Agencies § 17a-145-149 (a)
and (b). Even when a foster parent disagrees with the
child's permanency plan, that foster parent must put

his or her personal feelings aside because a foster parent "shall comply" with the permanency plan as well as "work cooperatively with the department . . . ." Regs., Conn. State Agencies, § 17a-145-149 (a); see also *Hunte* v. *Blumenthal*, supra, 238 Conn. 165 ("foster parents must comply with the guardian's plan for the child without regard to when the department implements that plan" (internal quotation marks omitted)). Because the role and responsibility of foster parents is circumscribed by statute and regulation, the doctrine of permissive intervention, which requires a movant to advance an interest distinct from that of existing parties, is simply incompatible with the existing statutory and regulatory framework that allows the department to define and to control the responsibilities of foster parents, especially with respect to the child and their biological parents. See *Horton* v. *Meskill*, supra, 187 Conn. 197 (permissive intervention considers "the proposed intervenor's interests in the controversy [and] the adequacy of representation of such interests by existing parties"); see also part III A of this opinion.

Because this court construes statutes so as to comply, rather than conflict, with constitutional requirements; see *In re Valerie D.*, supra, 223 Conn. 534–35; I would conclude that the legislature, in enacting and amending § 46b-129, carefully crafted a specific and limited role for foster parents in child protection proceedings that does not infringe on the fundamental rights of biological parents. I respectfully submit that the majority improperly expands that limited role in child protection proceedings involving biological parents whose rights have not been terminated. Indeed, this court has long recognized limitations on the ability of foster parents to participate in child protection proceedings because, in light of a biological parent's fundamental interest, allowing foster parents to intervene could "permit them to shape the case in such a way as to introduce an impermissible

ingredient . . . .” (Internal quotation marks omitted.) *In re Baby Girl B.*, 224 Conn. 263, 278, 618 A.2d 1 (1992).

Moreover, this court has specifically recognized the very real possibility that foster parents will impermissibly shape the litigation on a petition to terminate a biological parent's rights and has held that intervention under those circumstances violates a biological parent's rights. See *In re James O.*, 322 Conn. 636, 651–52, 142 A.3d 1147 (2016) (“[w]e do not permit foster or preadoptive parents to intervene in termination proceedings because to do so would permit them to shape the case in such a way as to introduce an impermissible ingredient into the termination proceedings” (internal quotation marks omitted)); see also *Hunte* v. *Blumenthal*, supra, 238 Conn. 164 (foster parents cannot “intervene in proceedings to terminate the rights of natural parents . . . nor do they automatically have standing to serve as ‘next friend’ of a removed foster child” (citation omitted)). Had the legislature intended to permit foster parents to intervene in such proceedings, it would have done so explicitly. See, e.g., *Costanzo* v. *Plainfield*, 344 Conn. 86, 108, 277 A.3d 772 (2022) (“[i]t is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly" (internal quotation marks omitted)); *Branford* v. *Santa Barbara*, 294 Conn. 803, 813, 988 A.2d 221 (2010) ("[w]e are bound to interpret legislative intent by referring to what the legislative text contains, not by what it might have contained" (internal quotation marks omitted)).

In addition, I note that, as with termination of parental rights proceedings, neglect proceedings "are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's [biological] parents with those of [foster] parents and therefore to reach a result based on such comparisons rather than on the statutory criteria." *In re Juvenile*

*Appeal (Anonymous)*, 177 Conn. 648, 672–73, 420 A.2d 875 (1979); see also *In re Baby Girl B.*, supra, 224 Conn. 275 ("[i]t is . . . essential, in considering a petition to terminate parental rights, to sever completely the issues of whether termination is statutorily warranted and whether a proposed adoption is desirable" (internal quotation marks omitted)). While the specter of this kind of insidious effect has been discussed in the context of termination of parental rights proceedings, it is no less dangerous—and may be more so—in the context of a hearing on the disposition of neglect proceedings, in which the burden of proof is governed by the less demanding preponderance of the evidence standard and because such proceedings occur before a termination petition is filed and adjudicated. See *In re Kamari C-L.*, 122 Conn. App. 815, 830, 2 A.3d 13, cert. denied, 298 Conn. 927, 5 A.3d 487 (2010); cf. *In re James O.*, supra, 322 Conn. 649 (clear and convincing evidence is burden of proof for termination of parental rights petition).

When a child is in foster care, there is always a risk that a trial court will engage in an improper comparison between the biological family and the foster family because the court is required to examine the needs of that particular child and whether those needs are being met in the child's current placement. See *In re Zarirai S.*, 229 Conn. App. 239, 263, 326 A.3d 1148 (2024) (trial court properly "considered several factors, one of which was the context of the children's foster placement, in finding that the children need a caregiver who provides permanency in their lives"). For example, in *In re James O.*, supra, 322 Conn. 636, the trial court "properly considered evidence of the children's foster placement as relevant" to whether the respondent mother had "fail[ed] to rehabilitate . . . [as] rehabilitation must be assessed with reference to the needs of the particular children at issue." Id., 652, 657. This court concluded

that the trial court, in "the context of [its] overall analysis . . . appropriately centered on the specific needs of [the children], a necessary consideration when determining whether a respondent has failed to rehabilitate." Id., 654; see also *In re November H.*, 202 Conn. App. 106, 138, 243 A.3d 839 (2020) (concluding that court did not make improper comparison between respondent and foster mother in adjudicatory phase); *In re Corey C.*, 198 Conn. App. 41, 82, 232 A.3d 1237 ("the reference to the lack of affect [the child] showed with the [biological] mother, compared to the warmth and attachment he showed with the foster parent, was used not to opine that the foster parent ought to be the person to meet [the child's] needs but, rather, was made on the basis of what the [therapeutic] professionals determined were [the child's] specific needs"), cert. denied, 335 Conn. 930, 236 A.3d 217 (2020). In *In re James O.*, this court reaffirmed the time-honored proposition that a comparison between the biological parent and a foster parent is improper, as it infringes on the constitutionally protected parent-child relationship, "reach[ing] a result based on such comparisons rather than on the statutory criteria." (Internal quotation marks omitted.) *In re James O.*, supra, 650. The majority ignores that fundamental precept and invites trial courts to make that improper and unconstitutional comparison by holding that foster parents may seek to permissively intervene in neglect proceedings.

As detailed more fully in part III of this opinion, the majority's holding will also enable foster parents to introduce improper considerations, consciously or unconsciously, before the trial court. The mere physical presence of foster parents in the courtroom, armed with private counsel and the undisputed fact that they provide care for the child twenty-four hours a day and seven days a week, immediately puts them in a superior position to a biological parent, who is seeking a revoca-

tion of commitment or moving to modify the disposition to protective supervision and whose struggle with his or her own parenting deficiencies is the reason that the child is in the foster parents' care in the first instance. In my view, such a scenario raises grave constitutional concerns and strikes me as fundamentally unfair. Foster parents play a vital role in this state's child protection system, which frequently requires their participation in the early stages of litigation as witnesses and persons whose insights and firsthand information are invaluable. Furthermore, a child's foster parents, as the primary caregivers, are likely to have relevant evidence that courts should take into account. See id., 651 (this court has "never held . . . that a foster parent may not testify during the adjudicative phase of a termination proceeding or that a trial court may not consider evidence that arises within the context of a foster placement that is relevant to one of the statutory grounds raised for termination of parental rights"). Indeed, the need to trust that foster parents can be advocates for the child without impeding reunification efforts is critical to their credibility. See id., 653 (trial court highlighted that foster mother was "willing to participate intensively in the children's therapy" and that child's progress with foster mother "makes clear [that] the process of healing and recovery must also occur in a home environment which the children have come to learn is safe and caring" (internal quotation marks omitted)). Moreover, any evidence by a foster parent relative to the child's best interest, including sensitive issues around how a child responds to visits, for example, would be *less credible* if advanced from his or her posture as a party, because that posture must necessarily be to advance the foster parent's interest under the doctrine of permissive intervention.

The fact that foster parents play a vital role and may provide relevant information nevertheless does not give

the trial court the authority to consider permissive intervention for nonrelative foster parents. The majority, however, inappropriately expands the foster parents' statutory role in these proceedings and thereby diminishes the "intrinsic human rights" that a biological parent has in his or her child. *Smith* v. *Organization of Foster Families for Equality & Reform*, supra, 431 U.S. 845. Accordingly, I would conclude that foster parents cannot permissively intervene in dispositional proceedings because allowing them to do so would elevate their role in such a way that is structurally and fundamentally unfair and in violation of a biological parent's, along with the child's, fundamental right to family integrity. As I discuss more fully in part IV of this opinion, I believe that the legislature, in enacting § 46b-129 and limiting a foster parent's participation in child protection proceedings to a right to be heard and comment on the best interest of the child, struck the proper balance between recognizing the extraordinary insights that a foster parent may provide and ensuring that a foster parent has a voice in such proceedings without tainting these proceedings with the risk of impermissible considerations.

### III

The majority's conclusion that nonrelative foster parents have standing to permissively intervene in the dispositional phase of a neglect petition grossly underestimates the impact that such intervention likely will have on those proceedings and overestimates the trial court's ability to limit that impact on the child protection system's paramount goal of assuring permanency for children with due regard for the constitutional rights of parents and children alike. The majority's holding will increase the risk and specter of prolonged foster care, which will only work to deprive these children of the permanency that the system is designed to provide. Because the law governing permissive intervention is

inconsistent with the statutorily circumscribed, but significant, role that foster parents have in the child protection system, the legislature prudently provided nonrelative foster parents with the limited "right to be heard" under § 46b-129 (p) and avoided the various procedural hurdles that often accompany such intervention, such as filing motions for injunctive relief and discovery like the foster parents did in the present case.

There are a myriad of ways for the trial court to be provided with the information that it needs. The limited and specifically defined nature of the evidence that a foster parent is authorized to provide under this statutory scheme is inconsistent with the majority's holding that nonrelative foster parents may permissively intervene in neglect petitions and proffer whatever evidence they choose under the inherently broad legal best interest standard. An intervenor is allowed into a case to assert his or her "interests in the controversy" only when those interests are not adequately represented already by the existing parties. *Horton* v. *Meskill*, supra, 187 Conn. 197. In this state, foster parents are required to support the goal of the approved permanency plan as well as the department's efforts at reunification, which the department is obligated by statute to provide. See General Statutes § 46b-129 (k) (2) (A); see also General Statutes § 17a-112 (j) (1). As a result, any appropriate interest advanced by a foster parent is, as a matter of law and policy, already represented adequately by the department and the petitioner. At the same time, the AMC and the GAL themselves play a vital role in representing the child's wishes as well as the child's best interest, respectively. Their duties require them to meet with the child, consult with various providers, and, in particular, meet with the foster parents. In their vitally important function, the AMCs operate as a check on the department's actions relative to the child. The AMC and the GAL are empowered and, indeed, obli-

gated to independently advance and convey the child's best interest. For those reasons, nonrelative foster parents have no appropriate interest under the rubric of a permissive intervention analysis that already is not represented by the existing parties as a matter of necessity. Nonetheless, recognizing the importance of foster parents in having a voice in these proceedings, the legislature proscribed a limited "right to be heard" for nonrelative foster parents under § 46b-129 (p).[16]

The majority's holding goes far beyond what was contemplated by the plain language of the statute[17] and, in doing so, increases the risk of impermissible comparisons between biological parents and foster parents at a time when the biological parents' rights to a child have not been terminated and the department remains obligated to work with them toward reunification. This

---

[16] General Statutes § 46b-129 (p) provides in relevant part: "A foster parent, prospective adoptive parent or relative caregiver shall receive notice and have the right to be heard for the purposes of this section in Superior Court in any proceeding concerning a foster child living with such foster parent, prospective adoptive parent or relative caregiver. A foster parent, prospective adoptive parent or relative caregiver who has cared for a child or youth shall have the right to be heard and comment on the best interests of such child or youth in any proceeding under this section which is brought not more than one year after the last day the foster parent, prospective adoptive parent or relative caregiver provided such care. . . ."

[17] In my view, a principal flaw in the majority's analysis is that it places undue weight on whether the Practice Book § 35a-4 conflicts with § 46b-129 (p), and, in doing so, overlooks the more fundamental question of whether § 46b-129 itself authorizes the permissive intervention of foster parents. See part II of the majority opinion ("there is no conflict between § 46b-129 and Practice Book § 35a-4 (c)"). My analysis, instead, focuses on whether the legislature authorized permissive intervention for foster parents in § 46b-129, as our rules of practice cannot confer any rights not authorized by the General Statutes or other law. See footnote 9 of this opinion. The Appellate Court's analysis in *In re Ryan C.* appropriately adhered to that long established precedent that our rules of practice have limited authority and are constrained by the General Statutes. See *In re Ryan C.*, supra, 220 Conn. App. 526 (expressly recognizing that "Practice Book § 35a-4 cannot be interpreted in a manner that enlarges a foster parent's rights under § 46b-129 (p)"). As such, my analysis focuses on § 46b-129.

heightened risk of an impermissible comparison will make it more difficult for trial court judges to determine the best interest of the child without that taint, thereby increasing the likelihood of reversible error and causing further delays in permanency for the children who are the subject of these neglect petitions. The negative effects of the majority's holding today, however, will not be limited to neglect proceedings. By authorizing nonrelative foster parents to intervene in child protection proceedings, the mere advancement of a motion to intervene that is premised on *their* right to family integrity or any other interest not otherwise already subsumed by either the petitioner or the AMC imperils any attempt by the department to pursue a termination of parental rights. If reunification fails and termination of parental rights is pursued, the trial court must determine whether the biological parent has been prevented from maintaining a meaningful relationship with the child due to an unreasonable act of a third person. See General Statutes § 17a-112 (k) (trial court "shall make writing findings regarding . . . (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by . . . the unreasonable act of any [third] person").

In that vein, I note that the extraordinary act of seeking intervention by a foster parent, where he or she must establish his or her *own* interest that is not adequately represented by another party is in and of itself compelling fodder for a claim by respondent parents that they have been prevented from maintaining a meaningful relationship with their child. I cannot conceive of any claim for permissive intervention that would not be used by a respondent vigorously and with compelling force to defend and to defeat a termination of parental rights case. It effectively establishes a legally sanctioned wedge between a respondent and his or her child, and that is simply untenable. I do not believe

that the legislature, in enacting and amending § 46b-129, intended such a bizarre and unworkable result. See, e.g., *In re Flanagan*, 240 Conn. 157, 183, 690 A.2d 865 (when construing statutes, "we will avoid constructions that lead to absurd, unworkable or bizarre results"), cert. denied sub nom. *Flanagan* v. *Judicial Review Council of Connecticut*, 522 U.S. 865, 118 S. Ct. 172, 139 L. Ed. 2d 114 (1997).

Moreover, the majority overlooks the practical effect of its holding on judicial economy, as the intervention of nonrelative foster parents will inevitably cause delays in permanency while the children languish in extended foster care for the conclusion of trial court proceedings. These delays will be caused, in part, by the fact that foster parents have the authority to interject extraneous matters into the child protection proceedings, as the foster parents did here, such as when they refocused the proceedings on the question of whether they had interfered with reunification efforts. Instead of intervening and delaying these proceedings, the foster parents could have, instead, vindicated their right to be heard under § 46b-129 (p) and, also, requested an administrative hearing if any allegations of interference had an impact on their foster care license, as they argued in the trial court. See Regs., Conn. State Agencies § 17a-145-55.

A

Permissive intervention is inconsistent with a nonrelative foster parent's limited role in the statutory scheme governing neglect petitions. That inconsistency explains why the legislature specifically provided nonrelative foster parents with a "right to be heard" under § 46b-129 (p), because allowing permissive intervention leads to impermissible comparisons between the biological parent and the foster parent. When a nonparty seeks to intervene, he or she must demonstrate an interest

in the controversy that is not already represented adequately by the parties to that action. See *Horton* v. *Meskill*, supra, 187 Conn. 197. The question of "permissive intervention [is] committed to the sound discretion of the trial court," and the party challenging an order regarding permissive intervention "bear[s] the heavy burden of demonstrating an abuse of that discretion if they are to prevail. . . . [I]n determining whether to grant a request for permissive intervention, a court should consider several factors: the timeliness of the intervention, the proposed intervenor's interest in the controversy, the adequacy of representation of such interests by other parties, the delay in the proceedings or other prejudice to the existing parties the intervention may cause, and the necessity for or value of the intervention in resolving the controversy." (Citations omitted.) *In re Baby Girl B.*, supra, 224 Conn. 277. In part II of this opinion, I described a foster parent's interest in the controversy, which interest emanates solely from our General Statutes and is unlike the inherent constitutional interest of a biological parent. I now detail how, in light of a foster parent's limited role under the statutory framework to support the petitioner and the department, the doctrine of permissive intervention is simply incompatible with that framework because it requires the foster parent to advance his or her own interest distinct from the existing parties, including the petitioner, the AMC, and the GAL. I also note the prejudice that will result from allowing nonrelative foster parents to intervene will cause, specifically, unnecessary delays in child protection proceedings and the permanency for the children.

When considering whether the proposed intervenor's interest is adequately represented, or if intervention is warranted, "[t]he most significant factor . . . is how the interests of the [proposed intervenor] compare with the interests of the present parties . . . ." (Internal

quotation marks omitted.) *Litwin* v. *Ryan*, 131 Conn. App. 558, 564, 27 A.3d 71 (2011). The proposed intervenor faces a heavy burden when his or her interests and those of the parties "are identical or there is a party charged by law with representing a proposed intervenor's interest . . . ." (Internal quotation marks omitted.) Id. In such cases, there is "a presumption of adequate representation" that may be overcome "only through a compelling showing of why this representation is *not* adequate." (Emphasis in original; internal quotation marks omitted.) Id. There is a contrary presumption, however, that a proposed intervenor's interest is not adequately represented when he or she "must rely on his [or her] opponent or one whose interests are adverse to his [or hers]." (Internal quotation marks omitted.) Id.

In order to be granted permissive intervention, a foster parent therefore must demonstrate an interest in the disposition of the petition, as foster parents have no interest in the adjudication of neglect. See *In re Vincent D.*, 65 Conn. App. 658, 665, 783 A.2d 534 (2001) (foster parents "have no personal legal interest at stake"); see also *In re Santiago G.*, 325 Conn. 221, 234, 157 A.3d 60 (2017) (foster parents have "no right to intervene in the adjudicatory phase of a termination of parental rights action"). Foster parents also have no proper personal interest, distinct from that of the petitioner, in the disposition of the neglect petition and other dispositional, postneglect hearings, as foster parents are obligated to put their personal feelings aside in order to support the approved permanency plan as well as the department's reunification efforts.

Irrespective of a foster parent's personal interest, the department's regulations, which are binding on the foster parents, require them to support the permanency plan adopted by the department and to facilitate reunification, even when a foster parent disagrees with both.

See *Abreu* v. *Leone*, 120 Conn. App. 390, 408, 992 A.2d 331 ("department possesses the authority to control foster parents in the discharge of their duties"), cert. denied, 297 Conn. 926, 998 A.2d 1193 (2010). The department is obligated to facilitate reunification with the biological parent, and has a variety of ways to ensure that foster parents support reunification. See General Statutes § 17a-111b (a); see also *In re Paul M.*, 148 Conn. App. 654, 662–63, 85 A.3d 1263, cert. denied, 311 Conn. 938, 88 A.3d 550 (2014). Initially, when applying to be a foster family, the department "shall . . . determine the ability of the foster family . . . to work with the . . . department to pursue the child's treatment plan including reunification with the biological family." Regs., Conn. State Agencies § 17a-150-90. Once an application has been granted, the department's regulations expressly require a foster parent to support the services that facilitate reunification, and "[f]oster parents shall be active participants in reunification of the child with the child's biological family." Regs., Conn. State Agencies § 17a-145-149 (b). Even if the goal is not reunification, foster parents are obligated to "work cooperatively with the department . . . in all matters pertaining to the child's welfare," which includes ensuring "[compliance] with the treatment plan for the child . . . ." Regs., Conn. State Agencies § 17a-145-149 (a). The department's policies further obligate foster parents to make a "strong commitment to the child and to be supportive whether the child remains with them permanently or is returned to the birth family." 2 Dept. of Children & Families, Policy Manual (effective August 30, 2019) § 23-3, p. 6, available at https://portal.ct.gov/-/media/dcf/policy/chapters/233-childrens-bill-of-rights-82019.pdf (last visited March 18, 2025). Consequently, a foster parent's interest in the neglect proceeding is aligned with the petitioner's interest as a matter of law because department regulations and policy require a

foster parent to support the child's permanency plan and reunification efforts.

Indeed, even if the department's plan is not reunification with the biological parent, the statutory scheme illustrates that foster parents must continue to assist the department in those efforts. As specified in § 46b-129 (k) (2), the "court shall approve a permanency plan that is in the best interests of the child or youth and takes into consideration the child's or youth's need for permanency." The department's permanency plan "may include the goal of (A) revocation of commitment and reunification of the child or youth with the parent or guardian, with or without protective supervision; (B) transfer of guardianship or permanent legal guardianship; [or] (C) filing of termination of parental rights and adoption . . . ." General Statutes § 46b-129 (k) (2).

If the permanency plan is for revocation of commitment and reunification, then a foster parent clearly is obligated to assist the department in those reunification efforts. See Regs., Conn. State Agencies § 17a-145-149 (b). Additionally, if the approved permanency plan is a permanent legal guardianship, "[t]he court shall order specific steps that the parent must take to facilitate the return of the child or youth to the custody of such parent." General Statutes § 46b-129 (j) (4). Accordingly, the foster parents must assist with the department's reasonable efforts toward reunification despite the planned transfer of guardianship or permanent legal guardianship. See *In re Pedro J. C.*, 154 Conn. App. 517, 537, 105 A.3d 943 (2014) (noting that "[t]here are well established, mandated procedures [employed] to promote reunification once a child has been adjudicated neglected," which include "[issuance of] specific steps to the [petitioner] and the respondent to facilitate reasonable efforts toward a safe and successful reunification"), overruled on other grounds by *In re Henrry P. B.-P.*, 327 Conn. 312, 173 A.3d 928 (2017). If the

permanency plan is termination of parental rights and adoption, as was the case initially here, then the department is still required to provide reunification efforts under that statutory scheme, which, again, foster parents are obligated to support. See General Statutes § 17a-112 (j) (1) (termination of parents rights requires finding that department "has made reasonable efforts to locate the parent and to reunify the child with the parent");[18] see also General Statutes § 46b-129 (j) (5) ("[u]pon the issuance of an order committing the child or youth to the [petitioner] . . . the court shall determine whether the department made reasonable efforts to keep the child or youth with his or her parents or guardian prior to the issuance of such order and, if such efforts were not made, whether such reasonable efforts were not possible"); General Statutes § 46b-129 (k) (3) ("the department shall document for the court: (A) [t]he manner and frequency of efforts made by the department to return the child home or to secure placement for the child with a fit and willing relative, legal guardian or adoptive parent"); General Statutes § 46b-129 (k) (4) ("[a]t a permanency hearing . . . the court shall . . . determine whether the [petitioner] has made reasonable efforts to achieve the permanency plan").

Moreover, to the extent that a foster parent claims an interest in the best interest of the child that is not advanced by the petitioner already, it is necessarily subsumed by the AMC and the GAL, who represent the child's wishes and best interest, respectively.[19] Signifi-

---

[18] It bears repeating that, should the petitioner pursue a termination of parental rights, the respondent parent would have, in my opinion, a more than colorable claim that a foster parent who intervened in a neglect proceeding interfered with that parent's efforts at reunification.

[19] There is "often no bright line between the roles of a [GAL] and [an AMC, yet] the legal rights of a child may be distinct from the child's best interest. . . . While the best interest of a child encompasses a catholic concern with the child's human needs regarding his or her psychological, emotional, and physical well-being, the representation of a child's legal interests requires vigilance over the child's legal rights. Those legal rights have been enumerated as the right to be a party to a legal proceeding, the

cantly, unlike a foster parent, both GALs and AMCs are required to exercise their own judgment, independent from the department. See General Statutes § 46b-129a (2) (D); see also *Carrubba* v. *Moskowitz*, 274 Conn. 533, 539, 877 A.2d 773 (2005) ("[A]n [AMC] should provide independent representation of the child's interests . . . . In other words, the [AMC] is just that, an attorney, arguing on behalf of his or her client, based on the evidence in the case and the applicable law." (Internal quotation marks omitted.)). When a foster parent advances concerns about a child and is not credited by the petitioner, he or she can raise those concerns with either the AMC or the GAL, who would have an independent obligation to evaluate and bring those concerns to the trial court and pursue whatever remedies he or she sees fit, so long as the AMC or GAL agreed that they were in the child's legal interest or best interest, respectively. See, e.g., *In re Victor D.*, 161 Conn. App. 604, 610, 128 A.3d 608 (2015) (AMC opposed department's plan for reunification and respondent's motion for revocation of commitment and subsequently filed and prevailed on termination of parental rights petition). It is not unusual for the children's attorneys to take positions adverse to the department, and, when necessary, to produce their own witnesses, including the foster parents. In my view, the sole way to advance claims by the foster parents relative to the best interest

right to be heard at that hearing and the right to be represented by a lawyer. . . . Generally speaking, then, [the AMC] bears responsibility for representing the legal interest of a child while a [GAL] must promote and protect the best interest of a child." (Citation omitted; internal quotation marks omitted.) *In re Christina M.*, supra, 280 Conn. 491–92; see also *In re Kadon M.*, 194 Conn. App. 100, 106–107, 219 A.3d 985 (2019). Additionally, a GAL often possesses specialized training in family therapy or psychology, as the requirements for being appointed a GAL include proper training and a license in either the law or "in the areas of clinical social work, marriage and family therapy, professional counseling, psychology or psychiatry . . . ." Practice Book § 25-62 (b) (1); see also Practice Book § 25-62A (AMC requirements).

of the child that are not also adopted by the department, without unconstitutionally tainting the proceedings, is through the AMC and GAL.

Moreover, because any interest that a foster parent has in neglect proceedings already is represented by the petitioner, the AMC, and the GAL, it was logical for the legislature to limit a foster parent's ability to participate in neglect proceedings to "the right to be heard . . . ." General Statutes § 46b-129 (p); see also *C. W. B.* v. *A. S.*, 410 P.3d 438, 440 (Colo. 2018) (holding that, because GALs are "statutorily obligated to advocate for the best interests of the child, including on appeal, there [was] no need to confer standing on foster parents to represent the best interests of the child on appeal"). An interest advanced by the foster parents that is neither assumed by the department or the children is either irrelevant, outside the scope of the foster parents' roles and responsibilities relative to the child, or asserts an interest, if not adopted by the child, that undermines the *child's* right to family integrity. The legislature imposed this limitation because intervention is unnecessary in this particular context, as a nonrelative foster parent's interest in the neglect proceedings, if within the scope of his or her roles and responsibilities, already is adequately represented. Permissive intervention is not only unnecessary but improper because it enables a foster parent to inject his or her personal interest into the neglect proceedings, leading to impermissible comparisons between a biological parent and a foster parent and delays, leaving the neglected children who are the subject of these petitions to languish in foster care, which is unconscionable.

B

Allowing the permissive intervention of nonrelative foster parents effectively sanctions a process which structurally invites the improper comparison of a bio-

logical parent with a foster parent during neglect proceedings. That comparison infringes on a biological parent's constitutional rights and makes it more difficult for a trial court to determine the child's best interest without the taint of impermissible considerations. This court has expressly prohibited the improper comparison of a foster parent to a biological parent in the context of termination of parental rights petitions; I can conceive of no reason why, in the context of a neglect proceeding, such comparisons are no less unconstitutional and inevitable. Because allowing the intervention of nonrelative foster parents creates an inherent risk that a court will make impermissible comparisons between foster and biological parents in the context of neglect proceedings, the legislature wisely limited the participation of a nonrelative foster parent to the right to be heard and comment on the child's best interest. This limitation strikes the proper balance between ensuring that foster parents are given an opportunity to participate meaningfully in such proceedings and protecting the integrity of those proceedings, the proper focus of which is on the best interest of the child and the respondent's right and ability to parent her.

This court has cautioned that "determinations [in child protection matters] are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents and therefore to reach a result based on such comparisons rather than on the statutory criteria." (Internal quotation marks omitted.) *In re James O.*, supra, 322 Conn. 650; see also *In re Zakai F.*, supra, 336 Conn. 301 ("[r]einstatement of guardianship proceedings employ the best interests of the child analysis . . . which leaves the reinstatement determination usually open to the subjective assessment of the trial judge" (citation omitted)).

Due to the grave risk presented by that improper comparison, our law "do[es] not permit foster or preadoptive parents to intervene in termination proceedings because to do so would permit them to shape the case in such a way as to introduce an impermissible ingredient into the termination proceedings." (Internal quotation marks omitted.) *In re James O.*, supra, 651.

I cannot fathom how that risk is any less serious in neglect proceedings. The majority relies on the distinction between the adjudicative and dispositional phases and argues that I have "overlook[ed]" that distinction. Footnote 29 of the majority opinion. I am acutely aware of that distinction. Indeed, because of the procedural posture of a neglect petition in relation to a petition to terminate parental rights, I find that distinction wholly irrelevant,[20] except to point out that the protections afforded by the dichotomy of an adjudication versus a disposition are eviscerated by allowing permissive intervention of nonrelative foster parents in any stage prior to the termination of a biological parent's rights. A biological parent's parental rights remain intact during the pendency of neglect proceedings, and the events that transpire during the course of neglect proceedings may be used as evidence in the adjudicatory phase of a termination of parental rights petition. See *In re Joseph M.*, 158 Conn. App. 849, 862, 120 A.3d 1271 (2015) ("[i]t is well settled that courts are required to consider only facts that occurred prior to the filing of the termination petition when making a reasonable efforts assessment"); see also *In re Cameron W.*, 194 Conn. App. 633, 660, 221 A.3d 885 (2019) ("the court is required in the adjudicatory phase to make its assessment *on the basis*

[20] There is a difference, of course, with respect to relative intervention pursuant to § 46b-129 (d) (1) (C) because they are not state actors under the bailiwick of the department's authority and control and, as the legislature implicitly recognizes, the child's right to family integrity extends, to some extent, to biological extended family.

*of events preceding the date on which the termination petition was filed*" (emphasis in original; internal quotation marks omitted)), cert. denied, 334 Conn. 918, 222 A.3d 103 (2020). I can see no reason why a biological parent's rights are less worthy of protection from the risk of an improper comparison when foster parents intervene during the dispositional phases of neglect proceedings, especially because, short of termination, a biological parent's rights remain intact. In other words, the rationale and constitutional principles that hold that foster parents may not intervene in termination proceedings necessarily encompass the neglect proceedings that occur before a termination of parental rights adjudication because a biological parent has not lost that fundamental constitutional interest in family integrity.[21]

Indeed, I believe the risk is greater because neglect proceedings generally precede termination of parental

---

[21] Moreover, the salient issue during disposition is a child's best interest, which is an evidentiary question. As a result, any evidence that "tend[s] to support a relevant fact [regarding a child's best interest] even to a slight degree" should be considered, and, consequently, the suitability of a foster parent's home certainly becomes relevant in the dispositional phase. (Internal quotation marks omitted.) *State* v. *Patterson*, 344 Conn. 281, 295, 278 A.3d 1044 (2022). I nonetheless maintain that the comparison that is inevitable between an intervening foster parent and a biological parent is unconstitutional because, "despite their obvious concern about the outcome of [the child protection] proceeding, [foster parents] have no personal legal interest at stake . . . ." *In re Vincent D.*, supra, 65 Conn. App. 665. The majority's holding improperly authorizes foster parents to participate as parties and interfere with a biological parent's fundamental right to family integrity when that biological parent's rights have not been terminated. See *Roth* v. *Weston*, 259 Conn. 202, 221, 223, 789 A.2d 431 (2002) ("the best interests of the child are secondary to the parents' rights" when they have not been terminated and "parents should not be faced with unjustified intrusions into their decision-making in the absence of specific allegations and proof of [a parent-like relationship between a person seeking visitation and the child]"); see also *In re Riley B.*, 342 Conn. 333, 351, 269 A.3d 776 (2022) (biological mother "has no colorable claim to intervention as of right" because, following termination of biological mother's parental rights, "she lacks a direct and substantial interest" in visitation (internal quotation marks omitted)).

right petitions, and, when the respondent or the petitioner seeks to revoke commitment and/or modify the disposition to protective supervision, a foster parent who has intervened necessarily has inherent advantages, material and otherwise, including the parent-like attachment that children will naturally feel for foster parents who have fulfilled their role well and ensured that the child's emotional, psychological, physical and educational needs are met. There is nothing sinister or inappropriate in the fact that a bond occurs and, indeed, it has long been recognized that healthy development in children depends on healthy and trusting attachments with their primary caregiver. This is why it is vitally important that a foster parent commit to support the department's permanency plan and can be trusted to do so.[22] But a biological parent who seeks to reunify— even if he or she has made significant progress in his or her rehabilitation—is necessarily in an inferior position to foster parents simply by virtue of the fact that the child is not physically in his or her care. When one adds the superior knowledge and control a foster parent has over the child and his or her environment, the intervention of foster parents, who are more likely to retain private counsel, operates to create a structural disadvantage of constitutional dimension for respondent par-

[22] Notably, even relatives who have intervened and have been granted temporary custody by the court are subject to orders of the court that require them to cooperate with the department's permanency plans and services pursuant to § 46b-129. "If the court grants such relative temporary custody during the period of such temporary custody, such relative shall be subject to orders of the court, including, but not limited to, providing for the care and supervision of such child or youth and cooperating with the [petitioner] in the implementation of treatment and permanency plans and services for such child or youth. The court may, on motion of any party or the court's own motion, after notice and a hearing, terminate such relative's intervenor status if such relative's participation in the case is no longer warranted or necessary." General Statutes § 46b-129 (d) (3). This provision underscores the importance of temporary caregivers, including relative caregivers whose custody occurs through the court as opposed to being licensed by the department, cooperative with the department.

ents. In the context of termination of parental rights proceedings, we have long warned that the court must be careful not to improperly compare a biological parent to a foster parent,[23] as "[a] parent cannot be displaced because someone else could do a better job raising the child." (Internal quotation marks omitted.) *In re Corey C.*, supra, 198 Conn. App. 80. It is therefore reversible error for a trial court to base "a termination of parental rights . . . on a finding that a child's prospective foster or adoptive home will be 'better' than life with one or more biological parent." *In re Paul M.*, 154 Conn. App. 488, 505, 107 A.3d 552 (2014). Allowing the permissive intervention of nonrelative foster parents in neglect proceedings necessarily gives them an elevated status that cannot be reconciled with a statutory scheme that recognizes them as state actors and requires the department to make reasonable efforts to reunify with a biological parent,[24] and a constitutional framework that prohibits the court from making impermissible comparisons between a foster parent and a biological parent.

The majority's holding today not only creates an unacceptable risk of improper comparisons between respon-

---

[23] Attempting to balance the competing interests in these cases is uniquely precarious because a judge can easily be accused of "consciously or unconsciously" engaging in the improper comparison between an intervening foster parent and a biological parent; *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 672–73; and, if appealed, reviewing courts are apt to "take the trial court's unambiguous comparison[s] at face value . . . [w]hether . . . a conscious comparison by the court or an inartful choice of words . . . ." *In re James O.*, supra, 322 Conn. 660 (*McDonald, J.*, concurring).

[24] This court, of course, does not review those cases that are resolved without the need for an appeal and in which highly motivated foster parents and biological parents, whose rehabilitative progress includes a willingness to be sensitive to a child's natural affection and bond with their primary caregiver, are able to assist with an appropriate transition to the biological parent. Cf. *In re Victor D.*, Superior Court, judicial district of Middlesex, Docket No. CP-100007160-A (November 7, 2014) (foster parents were diligent in supporting minor child to feel positively about visiting with respondent father, who minimized concerns over child's ties to foster parents), aff'd, 161 Conn. App. 604, 128 A.3d 608 (2015).

dent parents and foster parents in neglect proceedings but also raises systemic concerns implicating termination of parental rights petitions as well. Dispositional hearings following the adjudication of a neglect petition are part and parcel of an arc of litigation for which the paramount goal is to effectuate permanency—whether that means reunification, termination of parental rights and adoption, or transfer of guardianship—that is consistent with the child's best interest. Unless and until there is a determination by the court that they are no longer appropriate, the petitioner is obligated to make reasonable efforts at reunification, including when a child is in a preadoptive home. If reunification efforts fail and the petitioner seeks to terminate the biological parent's rights, "the court is statutorily required to address in writing 'the feelings and emotional ties of the child with respect to . . . any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties' "; id., quoting General Statutes § 17a-112 (k) (4); as well as "the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by . . . the unreasonable act of any other person . . . ." General Statutes § 17a-112 (k) (7). In my view, the very act of seeking to intervene by foster parents, who either advance the claim that they have their own right to family integrity or seek any remedy that can be viewed as an impediment to reunification, risks undermining the option of termination of parental rights and adoption of a child. Although I recognize that § 17a-112 (k) (7) is only one of seven dispositional factors and is not dispositive of a contrary best interest finding; see *In re Nioshka A. N.*, 161 Conn. App. 627, 635, 128 A.3d 619 ("seven factors serve simply as guidelines to the court and are not statutory prerequisites" (internal quotation marks omitted)), cert. denied, 320 Conn. 912, 128 A.3d 955 (2015);

it is one of the written findings that has constitutional dimensions and could be powerfully wielded as a defense to a termination if there was significant evidence to support it, which permissive intervention invites. See General Statutes § 17a-112 (k) (4) and (7).

Additionally, permissive intervention in a neglect proceeding can be used by a foster parent to effectively bypass the more difficult requirements needed for termination of parental rights and adoption, including the requirement to establish, by clear and convincing evidence, that the department has met the legal standards of reasonable efforts and that the respondent failed to rehabilitate pursuant to § 17a-112 (j). If, instead of seeking the termination of parental rights and adoption, a foster parent intervened in a dispositional neglect proceeding and filed a motion to transfer custody and guardianship, the foster parent would have to satisfy the lower preponderance of the evidence standard of proof. See *In re Kamari C-L.*, supra, 122 Conn. App. 830. Termination petitions are subject to the stringent clear and convincing evidence standard as well as the requirement that the petitioner make reasonable efforts and meet her burden with respect to the legal standard governing the failure to rehabilitate and other grounds pursuant to § 17a-112. See *In re James O.*, supra, 322 Conn. 649. That distinction is a significant one and provides further evidence that the legislature properly limited the participation of foster parents to a statutory right to be heard in neglect proceedings. General Statutes § 46b-129 (p).[25]

C

Additionally, the majority's holding will be detrimental to judicial economy and will "undermine the state's

___

[25] It should also be self-evident that creative legal theories advanced by the bar, while admirable from an academic perspective and not inappropriate coming from attorneys whose clients are the children and parents who are properly before the court, can nonetheless wreak havoc on judicial economy by straining resources on a child protection system obligated to operate in

important interest in protecting the welfare of children." *In re Na-Ki J.*, 222 Conn. App. 1, 13, 303 A.3d 1206, cert. denied, 348 Conn. 929, 304 A.3d 860 (2023). The delay this will cause in permanency for these children is unacceptable.[26] See *In re Brian P.*, 195 Conn. App. 582, 593, 226 A.3d 152 (2020) ("[i]n child protection proceedings, time is of the essence, and permitting intervention after the conclusion of the termination proceedings would unnecessarily delay permanency" and negatively affect child's best interest). Not only will the intervention of foster parents extend the litigation in the trial court, it will also increase the likelihood of more appeals that further extend the litigation and delay.

When the foster parents are allowed to intervene as parties, they likely will be given the right to advance their own interests by calling witnesses and presenting evidence, taking a tremendous toll on the time that it takes to litigate these petitions.[27] See *Khan* v. *Yale University*, 347 Conn. 1, 31, 295 A.3d 855 (2023) ("stress[ing] the importance of procedures such as the opportunity for parties to call witnesses"); see also *In re Juvenile Appeal (Docket No. 10718)*, supra, 188

---

a timely manner in juvenile matters.

[26] Although I am cognizant of the fact that the child was in the care of the foster parents for more than six years, it is important to note that, when Humphrey's evaluation report was received in June, 2019, the child was turning four years old.

[27] I recognize that the majority has left it to the discretion of the trial court to permit an intervening foster parent to call their own witnesses, cross-examine other parties' witnesses, and introduce evidence. Apart from my principal objection to such participation for the reasons stated in this dissent, I believe that determining the precise extent of a foster parent's participation on a case-by-case basis in the hands of a particular trial judge does nothing to limit the effects of delay because the best interest standard is inherently broad in its scope. Moreover, the ability to take an appeal premised on whether a court has abused its discretion on such rulings remains available, which presents yet another avenue of litigation and corresponding delay.

Conn. 262 (allowing intervention of foster parents in termination of parental rights proceeding "permit[s] them to shape the case in such a way as to introduce an impermissible ingredient into the termination proceedings"). Furthermore, foster parent intervention is more likely to introduce extraneous issues into the litigation that will distract the trial court from the task at hand, which is the best interest of the child. That is exactly what occurred here, when the foster parents were granted permission to intervene to advance personal interests, namely, to affirm their claim of family integrity and to rebut allegations that they had interfered with reunification.[28]

In this regard, the underlying proceedings in the present case bear emphasis. In July, 2015, the respondent was issued final specific steps for purposes of facilitating reunification. See *In re Shane M.*, 318 Conn. 569, 586, 122 A.3d 1247 (2015), citing General Statutes § 46b-129 (b), (c) (6), and (j) (3). Among those specific steps were to "[t]ake part in counseling and make progress toward the identified treatment [goal]" of individual parenting, to "[a]ddress mental health needs in individual counseling to maintain emotional stability . . . [c]reate and maintain [a] safe, stable and nurturing home environment," to "[s]ubmit to a substance abuse evaluation and follow the recommendations about treatment," to "[s]ubmit to random drug testing," "[n]ot

---

[28] I respectfully disagree with the majority's suggestion that the interest asserted by the foster parents in this neglect proceeding was not their own personal interest. In their motion to intervene, the foster parents specifically argued that they had "a direct and immediate interest" in "family integrity" with Jewelyette on the ground that she had been in their care for years. In doing so, they recognized that, pursuant to Practice Book §35a-4 (d), "a direct and immediate interest" in the proceedings is precisely what the juvenile court is required to consider. Moreover, they further argued that their interest in family integrity increased over time, notwithstanding their acknowledgement of contrary precedent. I fail how to see how the foster parents' interest in family integrity with a foster child is anything but personal in nature.

[to] use illegal drugs or [engage in] alcohol abuse," and to "[c]ooperate with service provider[s'] recommendations for parenting/individual/family counseling, in-home support services and/or substance abuse assessment/treatment . . . ." In April, 2017, the department "opined . . . that [the respondent] was unwilling or unable to benefit from reunification efforts because he continued to abuse alcohol, exhibit[ed] concerning mental health symptoms, and [broke] the law despite participating in services." (Internal quotation marks omitted.)

The psychological evaluations authored by Humphrey, the court-appointed clinical psychologist, however, indicated that the respondent made notable progress as time went on. Following his March, 2019 evaluation, when Jewleyette had been in the foster parents' custody for seventeen months, Humphrey reported that the respondent's "interaction with Jewelyette was positive overall" and that "[h]e engaged Jewelyette in a warm and nurturing manner. Jewelyette called him 'Daddy' . . . [and] [h]e nicely allowed her to paint his fingernails. . . . [The respondent] frequently offered demonstrations of affection, and Jewelyette responded positively. . . . My impression of Jewelyette's interaction with her father is that she knows him, trusts him, and enjoys spending time with him. . . . [Humphrey] would describe the relationship between [the respondent] and Jewelyette as positive. However, if the [c]ourt determines [that] Jewelyette should be reunified with [the respondent], it is my opinion this will be emotionally challenging for her, and perhaps result in intense emotions associated with loss, including anger, grief, and sadness. In this case, [Jewelyette's] relationship with [the respondent] may be tested, and they should be engaged in supportive therapy to help her with the adjustment." At that time, Humphrey refused to state

whether, as a permanent placement option, residing with the foster parents or the respondent was in Jewelyette's best interest and, instead, "offer[ed] only [his] opinion that [he] believe[d] [that] Jewelyette would be adequately cared for by either [the respondent] or her current caretakers [the foster parents] . . . ." Humphrey observed that the father, "on his own and through the assistance of his attorney, ha[d] made repeated, diligent efforts to prepare him for potential reunification with Jewelyette" and was open to "guidance about how to 'talk to Jewelyette' if she [was] to reunify and wanted contact with her foster family." At the same time, Humphrey recognized a chief obstacle to successful reunification would be the psychological distress, "perhaps in a lasting and ongoing way, [caused] by [her] removal from the people she knows as her parents."

The petitioner withdrew the petition to terminate the respondent's parental rights on August 13, 2019, following that evaluation, but another petition was filed on December 9, 2019, after an encounter with the biological mother that ultimately resulted in the respondent's arrest and conviction for larceny in the sixth degree. The trial on that petition, however, was canceled due to the COVID-19 pandemic. The petitioner then changed course over the summer of 2020, and made the not insignificant decision to change the permanency plans from seeking the termination of the respondent's parental rights to reunification. The petitioner therefore filed a motion on September 28, 2020, to approve a permanency plan that called for reunification. It was at this point that the foster parents, contrary to their obligations under the General Statutes and applicable regulations, began to resist reunification efforts and to obstruct the court proceedings. On March 15, 2021, Judge Taylor sustained the objection to the permanency plan calling for reunification filed by Jewelyette's attor-

ney, who argued that there was no psychological assessment to support the change in plan.

On October 29, 2021, Humphrey issued a third updated psychological evaluation and interactional study pursuant to the court order. In a stark reversal of the ambivalence he expressed in his 2019 evaluation, Humphrey now recommended reunification with the respondent as soon as possible. Humphrey recounted his past evaluations when the child responded well to the respondent and her behaviors then "suggested she knew him, trusted him, and enjoyed spending time with him." In 2021, Humphrey observed that the child "seemed prepared from the outset to engage in rejecting and resistant behavior toward [the respondent]," which the respondent "did not handle . . . well." After detailing numerous observations, Humphrey concluded that, in his opinion, "the most likely explanation for the marked shift in Jewelyette's attitude toward her father, and her behavior in his presence, is that she has been influenced to denigrate and reject him. There is little support for the notion that his behavior, in itself—given the history of the relationship—would result in Jewelyette's present posture."[29]

---

[29] In this final evaluation, Humphrey summarized the following observations or information provided to him by outside providers. He noted that, in 2020, when in-person visits were approved, the foster parents objected on the basis of a claim that someone in the home had compromised health and that Jewelyette asked the examiner whether he was going to meet with her " 'mommy and daddy' " and said that she was only pretending to eat the snacks her father brought, adding that they were gross and that she didn't like them, even though Humphrey observed her rapidly eating the snacks her father provided and she continued to do so while her father was putting them away. Humphrey noted that this was not only confirmed by the respondent, who claimed that Jewelyette would lie that she did not consume his food, but was similar to reports by a former service provider from the department, who Jewelyette had instructed to lie to her foster parents by saying she did not enjoy herself at visits with her father, even though the worker observed what she documented as a positive visit. Humphrey also observed that the child spontaneously told the foster parents in his presence that "she told [him] 'the truth' "—a phrase "commonly heard when children have been guided toward providing a specific set of data to

On November 8, 2021, the foster parents filed a motion to intervene "for the limited purpose of presenting evidence, including the cross-examination of witnesses, and argument regarding the best interests of the child in relation to the [respondent's] pending motion to revoke commitment and the motion to review the permanency plan." While that motion was pending, the department informed the foster parents on November 18, 2021, that Jewelyette would be "remove[d] . . . from their care on November 28, 2021, for the purpose of placing [her] in the home of a relative."

In response, the foster parents filed a habeas application on November 22, 2021, seeking, as relief, an order that the petitioner "refrain from removing [Jewelyette] from the care of the preadoptive foster parents" and that the petitioner "be permanently enjoined from removing [Jewelyette] from the foster parents." Judge Taylor issued a temporary injunction on November 24, 2021, "enjoin[ing] [the petitioner] from removing . . . . Jewelyette . . . from the home of [the foster parents]" until further order of the court. The court then granted the foster parents' motion to intervene on January 20, 2022, thereby enabling them to mount an opposition to the respondent's November 3, 2020 motion to revoke Jewelyette's commitment.

On April 20, 2022, more than five months after the foster parents' motion to intervene was filed and an injunction in their favor was granted, the respondent

an evaluator." He reiterated that the child's interview "was marked by her spontaneous and strong comments about not liking visits with the respondent, whom she would not refer to as her father." In addition, Humphrey watched the foster mother send Jewelyette to the waiting room with the reassurance that she would be " 'safe,' " leading Humphrey to express concern that "the foster parents may be casting [the respondent] as dangerous," even though Jewelyette was in the next room and only eight feet away. Humphrey concluded that it was "not unreasonable for [the respondent] to question whether there are forces actively working against him despite his efforts at rehabilitation and reunification with Jewelyette."

called Humphrey to testify in support of his motion to revoke. The hearing was dominated by the foster parents' focus on their own interest in caring for Jewelyette and their claims that they did not interfere with reunification, notwithstanding established precedent that they have no recognized right to family integrity.[30] Indeed, they argued that their right to family integrity increased the longer the child remained in their care. The respondent, whose right to family integrity is without doubt, to this day, and now his sister, the paternal aunt in whose care Jewelyette was placed, still await final resolution of the motion for revocation that he filed on November 3, 2020. Judge Taylor denied the motion to revoke four months after the last day of trial on Mary 15, 2023, and, in response to the Appellate Court's opinion in *In re Ryan C.*, the petitioner moved to remove the foster parents as parties on July 21, 2023.

The temporary injunction that the foster parents obtained in November, 2021, in response to indications that the department was seeking to reunite Jewelyette and the respondent, remained in place for almost three years, until July 16, 2024. At that time, the trial court, *Daniels, J.*, was "willing to provide temporary relief from the temporary injunction" that had prevented the department from removing Jewelyette. That injunction, which purported to be temporary, nevertheless enabled the foster parents to utilize permissive intervention as a procedural vehicle by which they extended the litigation on the respondent's motion to revoke commitment for years while advancing their own agenda.

---

[30] The foster parents were able to reshape the underlying child protection matter through their intervention so that the proceedings focused on the question of whether they had interfered with reunification efforts. Although a foster parent's interference could be relevant to a child's best interest, the question raised by this appeal is who should be the person to introduce such evidence into the proceedings. To the extent it is relevant to the child's best interest, I maintain that either the AMC, the GAL, the respondent, or the petitioner could offer evidence of alleged interference and, if appropriate, call a foster parent as a witness. See also part III A of this opinion.

This pattern of delay is not novel to the case before us. As illustrated in *In re Ryan C.*, supra, 220 Conn. App. 507, and *In re Andrew C.*, 229 Conn. App. 51, 326 A.3d 575, cert. granted, 350 Conn. 931, 326 A.3d 1107 (2024), and cert. granted, 350 Conn. 932, 326 A.3d 1107 (2024), the delays precipitated by the foster parents' intervention seem almost insurmountable when viewed through the eyes of a child. See *Feinberg* v. *Feinberg*, 114 Conn. App. 589, 590, 597 n.1, 970 A.2d 776 (2009) (three and one-half years in life of twelve year old was "a significant passage of time"), appeal dismissed, 302 Conn. 463, 28 A.3d 958 (2011) (certification improvidently granted).

In *In re Ryan C.*, supra, 220 Conn. App. 507, it took three years for the department to effectuate and finalize its plan to reunify the child with the respondent father after the foster parent took steps to intervene. See id., 514, 517. The department in that case had sought and obtained an order of temporary custody of Ryan C., as well as his sibling, in 2017, ultimately placing them with a foster parent. Id., 512. In 2020, after the department sought to reunify Ryan C. with the respondent father, the foster parent "filed an ex parte emergency motion to intervene for the sole purpose of seeking an emergency motion to stay, an ex parte emergency motion to stay the removal of Ryan C. from her home, a motion to intervene for purposes of seeking the transfer of guardianship of Ryan C. to her, and a motion to modify the current disposition of commitment and transfer guardianship to herself . . . ." Id., 514. The court granted the foster parent's ex parte emergency motion to intervene and emergency motion to stay on July 28, 2020. Id. In 2021, the foster parent then filed "an amended motion to intervene corrected . . . ." (Internal quotation marks omitted.) Id. The trial on the foster parent's motion to transfer guardianship, together with the petitioner's motion to revoke the child's commitment, did

not start until October 29, 2021, which was more than one year after the petitioner had planned to reunify Ryan C. and his father. Id., 514, 516. The trial was conducted over two additional nonconsecutive days[31] and, ultimately, concluded more than seven months later in June, 2022. Id., 516–17. The trial court rendered its decision four months after the conclusion of trial. Id., 517. Thereafter, the respondent father appealed, and it was not until July, 2023, that the appeal was resolved. See id., 510, 518. All in all, it was more than three years from when the foster mother first sought to intervene until this court denied her petition for certification, concluding appellate review. See id., 514; see also *In re Ryan C.*, 348 Conn. 901, 300 A.3d 1166 (2023).

Similarly, in *In re Andrew C.*, supra, 229 Conn. App. 51, which pertained to Ryan C.'s sibling, the case was not resolved until five years following the foster parent's filing of their motion to intervene. See id., 53–54, 56. The department obtained orders of temporary custody regarding Andrew C. and filed a neglect petition in 2017. Id., 54. In December, 2019, Andrew C.'s foster parents sought to intervene and their intervention was granted in January, 2020. Id., 54–55.[32] On July 20, 2020, the foster parents objected to the permanency plan that had called for reunification on the ground that it was not in Andrew C.'s best interest, and, on July 27, 2020, the foster par-

---

[31] It is very difficult to conduct a trial in a child protection matter over consecutive days, which are usually reserved for termination of parental rights proceedings and contested orders of temporary custody hearings. This brings to mind Judge Silbert's "Corollary to Murphy's Law," which is that "[t]he greater the number of attorneys in a given case, the harder it is to assemble them all in a single courtroom on a date certain." *In re Ann J.*, Superior Court, judicial district of New London, Juvenile Matters (November 19, 1993) (10 Conn. L. Rptr. 405, 406).

[32] The foster parents in *In re Andrew C.*, who had cared for the child for more than two years at that point, asserted in their motion to intervene that they had "an interest in keeping their family intact" and "in maintaining their family's integrity." (Internal quotation marks omitted.) *In re Andrew C.*, supra, 229 Conn. App. 54–55.

ents additionally filed "an emergency motion to stay the reunification of Andrew [C.] with the respondent." Id., 55–56.

On January 28, 2021, the juvenile court began a consolidated trial on the respondent's motion to revoke Andrew C.'s commitment, the foster parents' motion to transfer guardianship, and the petitioner's motion for review of the permanency plan. Id., 56. The trial, during which "the foster mother testified and the foster parents presented numerous exhibits and the testimony of several witnesses" of the court, concluded six months later in August, 2021. Id. The trial court ultimately granted the foster parents' motion to transfer guardianship of Andrew C. to them on December 2, 2021, six months after the conclusion of trial. Id. The respondent father did not appeal, but, in light of the Appellate Court's decision regarding Andrew C.'s brother in *In re Ryan C.*, supra, 220 Conn. App. 507, the respondent father filed a motion to open and vacate the trial court's judgment on October 2, 2023, which was granted three months later on January 3, 2024, from which the foster parents appealed. *In re Andrew C.*, supra, 229 Conn. App. 57–58. On November 4, 2024, the Appellate Court officially released its decision, holding that the foster parents "did not have standing to intervene . . . ." Id., 53. Although the foster parents were allowed to intervene promptly in January, 2020, it still took the trial court more than one year to hear and decide the respondent's motion to revoke and the foster parents' motion to transfer guardianship. Id., 55–56. Moreover, taking the foster parents' appeal into account, it took almost four years from the start of the consolidated trial until the conclusion of appellate review. See id., 56. As these two relatively recent decisions demonstrate, the intervention of foster parents frequently delays child protection proceedings for years.

Furthermore, the trial court's authority to allow for the permissive intervention of nonrelative foster parents also will have a negative impact on termination of parental rights petitions. The juvenile court is required to "make written findings regarding . . . (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by . . . the unreasonable act of any other person . . . ." General Statutes § 17a-112 (k). There can be little doubt that the delays attendant to allowing consideration of intervention motions can unduly prolong resolution of these cases.

Moreover, I am not persuaded that, once the majority's holding is entrenched as precedent, granting such motions will be rare, if not impossible. It is axiomatic that the circumstances of a child in foster care are among the most heartrending of cases in the whole of our judicial system. It is why these cases are also susceptible to the age-old maxim that bad facts make bad law. See *State* v. *McCoy*, 331 Conn. 561, 587, 206 A.3d 725 (2019). There will never be a shortage of those who will claim that the department is not doing enough or too little on behalf of the minor child. Yet such complaints should be advanced by those persons who are properly before our courts and whose fundamental rights—both the parent's and the child's—entitle them to an expeditious resolution of those complaints in our courts.

As the present case exemplifies, the practical effect of the majority's interpretation of § 46b-129 will be delay in child protection proceedings,[33] thereby "undermin[-

___

[33] In addition to extending the length of the litigation, the intervention of additional parties will cause additional scheduling issues, given that more witnesses, experts, and lawyers will need to attend "any proceeding" under § 46b-129. General Statutes § 46b-129 (p). In any given case before the juvenile court, there are typically a minimum of seven individuals required and/or given notice to participate: the petitioner, the department social worker, the respondent parents, each of whom typically have their own counsel, the AMC, and, when appropriate, the GAL. Each party has the opportunity

ing] the state's important interest in protecting the welfare of children." *In re Na-Ki J.*, supra, 222 Conn. App. 13. The negative "psychological effects of prolonged [child protection] proceedings on young children" means that "time is of the essence in custody cases." *In re Alexander V.*, 25 Conn. App. 741, 748, 596 A.2d 934 (1991), aff'd, 223 Conn. 557, 613 A.2d 780 (1992). Moreover, the majority's holding will increase the likelihood and frequency of appeals, both from unsuccessful foster parents and from the other parties should intervention be granted, even if those appeals are ultimately dismissed. See, e.g., *In re Santiago G.*, supra, 325 Conn. 223. A pending appeal in a child protection matter breeds uncertainty, which, of course, deprives the child of any sense of permanency until that appeal is resolved. Indeed, that was a concern in the present case during the hearing on November 4, 2024, when Jewelyette's attorney expressed concern that counsel was "attempt[ing] to set up yet another appealable issue" that would extend the underlying litigation yet again and lead to more uncertainty for Jewelyette.

In addition to extending the length of the actual litigation, allowing nonrelative foster parents to intervene in child protection proceedings will complicate the scheduling thereof. This is inimical to the child protection system, which is aimed to advance "the strong public interest in [the] prompt resolution of [child protection] cases so that the children may receive loving and secure home environments as soon as reasonably possible." (Internal quotation marks omitted.) *In re Amias I.*, 343 Conn. 816, 841, 276 A.3d 955 (2022). It bears repeating that "time is of the essence" and that "unnecessarily delay[ing] permanency" runs counter to

---

to call their own witnesses and to cross-examine same. As but one example, I note that Humphrey's cross-examination in the present case spanned multiple days and was delayed in order to allow newly appearing counsel to review the transcript of Humphrey's direct testimony.

the best interests of these children.[34] *In re Brian P.*, supra, 195 Conn. App. 593.[35]

Finally, I again underscore the important role that foster parents play in the child protection system. For that reason, allegations of interference with reunification should be taken seriously.[36] The foster parents,

[34] I also note two additional circumstances in which allowing foster parents the right to permissively intervene would unduly delay proceedings. First, the majority's decision would manifest in an opportunity for foster parents to appeal, creating parallel tracks in litigation, as evident in the present case, because there are no automatic appellate stays in child protection matters. See Practice Book § 61-11 (b). Second, those parallel tracks of litigation will prolong these proceedings and foment the uncertainty for these children, particularly, in the foreseeable circumstance when a foster parent appeals from the denial of a motion to intervene.

[35] The negative effects of these delays are compounded by the fact that our state's judicial resources are spread thin, which the Judiciary Committee repeatedly recognized during recent judicial confirmation hearings. Currently, with respect to child protection matters, which involve both delinquency and neglect proceedings, there are five judicial districts in which there is only one regular sitting judge, three judicial districts have two regular sitting judges, and two districts have three regular sitting judges. Moreover, four judicial districts do not have the support of either senior judges or judge trial referees, and the Child Protection Session in the Middlesex Judicial District has one senior judge and one judge trial referee. See also footnote 31 of this opinion, quoting Silbert's Corollary to Murphy's Law.

[36] The record before us, and Humphrey's 2021 report in particular, contains evidence that, if credited, suggests that the foster parents did in fact interfere with reunification in the present case. During virtual visits with the respondent, there were reports that it seemed like someone else was in the room with Jewelyette, as she would "look to the side, 'kind of . . . looking for approval.' " After positive visits with the respondent, Jewelyette would request that someone tell her foster parents that she cried during those visits. The foster parents also informed Jewelyette that she would be " 'safe,' " which Humphrey described as a concern. Most troubling are Humphrey's comments that Jewelyette would "spontaneous[ly] [launch] into complaints," which Humphrey noted is "commonly seen in custody . . . litigation, when a child has been influenced to express disdain for a parent figure." He then noted that Jewelyette would spontaneously claim that her foster parents do not direct her statements, which led Humphrey to find that "[s]uch an impromptu disclosure also typically indicates an adult or adults has either told a child what to say or has implied what should be said." Indeed, Humphrey stated in his report that "Jewelyette presents as a child who has been far too exposed to the legal issues that surround her . . . ." Finally, after noting that Jewelyette would abruptly change her behavior toward the respondent, Humphrey opined that "the most likely explanation for the marked shift in Jewelyette's attitude toward [the respondent],

however, do have a forum to contest such allegations of interference. Should those allegations impact the foster parents and their ability to foster children in the future, then they could "request an administrative hearing thereon in accordance with the Uniform Administrative Procedures Act [UAPA] . . . . Revocation or denial of renewal of license shall be stayed until such hearing is held except as provided in [the UAPA]." Regs., Conn. State Agencies § 17a-145-55. Moreover, after exhausting their administrative remedies, the foster parents could then pursue an appeal to the Superior Court. See General Statutes § 4-183.[37]

Because the foster parents in the present case contend that they are being incorrectly painted as interfering with reunification, I believe that claim is one that must be raised, in the first instance, in an administrative proceeding pursuant to § 17a-145-55 of the Regulations of Connecticut State Agencies, rather than in the midst of a neglect proceeding. See *Cannata* v. *Dept. of Environmental Protection*, 215 Conn. 616, 622, 577 A.2d 1017 (1990) ("[i]t is a settled principle of administrative law that, if an adequate administrative remedy exists, it must be exhausted before the Superior Court will obtain

and her behavior in his presence, is that she [had] been influenced to denigrate and reject him."

I recognize that, in his May 15, 2023 memorandum of decision denying the respondent's motion to revoke commitment, Judge Taylor did not credit Humphrey's report in this regard. Because the neglect proceeding before Judge Taylor was, in my view, fundamentally flawed as a result of the foster parents' participation therein, that credibility determination is of no moment and, indeed, constitutionally suspect as a result.

[37] In addition to pursuing administrative remedies with respect to his or her foster license, foster parents also may seek a writ of habeas corpus "regarding the custody of a child currently or recently" in their care for a certain period of time. General Statutes § 52-466 (f); see also *Terese B.* v. *Commissioner of Children & Families*, 68 Conn. App. 223, 230 n.10, 789 A.2d 1114 (2002) (noting legislature "provid[ed] foster parents a statutory right" to pursue writ). Although the provision does not limit its application to posttermination proceedings, I view this relief as one that does not have inherent constitutional infirmities once a biological parent's rights have been terminated.

jurisdiction to act in the matter" (internal quotation marks omitted)). For all those reasons, I would conclude that permissive intervention is not available to the foster parents in this case.

## IV

## A

In their writ of error, the foster parents claim that "[t]he trial court erred by failing to provide [them] their right to be heard at the November 4, 2024 hearing, as such right is intended under § 46b-129 (p) and other relevant law." I disagree. Section 46b-129 (p) plainly and unambiguously confers on foster parents a right to be heard and comment on the best interest of the child in neglect proceedings. In my view, that statutory right entitles foster parents to give a statement, which is either sworn or unsworn, in oral or written format, at a time that the trial court, in its discretion, deems most appropriate. See *Griswold* v. *Camputaro*, 331 Conn. 701, 709, 207 A.3d 512 (2019) ("the trial court has broad discretion in matters of case management"); *Connecticut Associated Builders & Contractors* v. *Hartford*, 251 Conn. 169, 191, 740 A.2d 813 (1999) ("[t]he trial court has inherent authority to supervise and manage the orderly presentation of evidence").

It bears repeating that a foster parent's duties, obligations, and role in child protection proceedings is carefully circumscribed by statute. Historically, in the context of neglect petitions governed by § 46b-129, the legislature has provided foster parents with the ability to speak to the child's current situation and best interest. I therefore would conclude that a foster parent's "right to be heard" under § 46b-129 (p) includes the right to give a statement, sworn or unsworn, through oral testimony or written statement, at a time deemed most appropriate by the trial court. Because the record indicates that the court complied with that statutory

requirement and did not abuse its discretion in doing so, I would conclude that the rights of the foster parents were not violated in this case.

In construing § 46b-129 (p), "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Hernandez* v. *Apple Auto Wholesalers of Waterbury, LLC*, 338 Conn. 803, 815, 259 A.3d 1157 (2021). We also must adhere to "the principle that the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires us to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *State* v. *Cody M.*, 337 Conn. 92, 102–103, 259 A.3d 576 (2020); see also *Broadnax* v. *New Haven*, 284 Conn. 237, 245, 932 A.2d 1063 (2007) ("[t]he meaning of the relevant terms of [a statute] becomes apparent when we view them, as we must, under our established rules of statutory construction, in context with the statutory scheme of which they are a part").

As this court has observed, "the ultimate standard underlying the whole statutory scheme regulating child welfare is the best interest of the child. The public policy of this state . . . is [t]o protect children whose health and welfare may be adversely affected through injury and neglect . . . to provide a temporary or permanent nurturing and safe environment for children when necessary . . . . Time is of the essence in child custody cases. . . . This furthers the express public policy of this state to provide all of its children a safe, stable nurturing environment. . . . When the child whose interest is to be protected is very young, delay in adjudication imposes a particularly serious cost on

governmental functioning." (Citations omitted; internal quotation marks omitted.) *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 439–40, 446 A.2d 808 (1982).

Furthermore, when constitutional rights are at issue, "courts are bound to assume that the legislature intended, in enacting a particular law, to achieve its purpose in a manner which is both effective and constitutional. . . . [T]his presumption of constitutionality imposes upon the trial court, as well as this court, the duty to construe statutes, whenever possible, in a manner that comports with constitutional safeguards of liberty." (Internal quotation marks omitted.) *Fish* v. *Fish*, 285 Conn. 24, 43, 939 A.2d 1040 (2008); see also *In re Valerie D.*, supra, 223 Conn. 534–35 (this court construes statutes so as to comply, rather than conflict, with applicable constitutional requirements). Moreover, "[w]e repeatedly have recognized that when fundamental rights are implicated . . . standing serves a function beyond a mere jurisdictional prerequisite. It also ensures that the statutory scheme is narrowly tailored so that a person's personal affairs are not needlessly intruded upon and interrupted by the trauma of litigation." (Internal quotation marks omitted.) *Fish* v. *Fish*, supra, 41. The plain language of subsection (p) of " 46b-129, its surrounding statutory scheme, its legislative history, and the constitutional rights at play convince me that the right extended to nonrelative foster parents is limited in nature and is not intended to permit their permissive intervention in neglect proceedings.

By its plain language, § 46b-129 (p) limits the participation of both current and former foster parents in dispositional hearings to "the right to be heard" and to "comment on the best interests of such child . . . ." It plainly and unambiguously authorizes a current or former foster parent to be heard with respect to any "observation or remark" that "express[es] an opinion or

attitude" about the best interest of the child. Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/comment (last visited March 18, 2025). Precisely what is encompassed by the right to be heard, however, is not specified in the statute, and, consequently, I look to the legislative history of a foster parent's statutory rights under § 46b-129, as well as the surrounding statutory scheme. The legislative history confirms that foster parents have no naturally given rights with respect to foster children and that the legislature always has provided a limited set of statutory rights to foster parents.

There is no relevant legislative history from initial passage of the provision in 1977 that provided foster parents with standing "for the purposes of [what is now § 46b-129]." Public Acts 1977, No. 77-273. It is noteworthy, however, that the plain language of the original subsection did not provide foster parents with unbridled standing to intervene in neglect proceedings. See General Statutes (Rev. to 1979) § 46b-129 (h). Instead, the legislature originally limited a foster parent's "standing" to "matters concerning the placement of a foster child living with such parent." General Statutes (Rev. to 1979) § 46b-129 (h). Because that was evidently too limited a role in the neglect proceedings, the legislature almost immediately amended that subsection to also provide foster parents with notice and standing to be heard with respect to the "revocation of commitment of a foster child" as well. Public Acts 1979, No. 79-579. Although there is no relevant legislature history, the fact that the initial law apparently was too constrictive, such that it had to be amended and expanded shortly thereafter, reflects the legislature's view that statutes concerning neglect proceedings are to be strictly construed so as to place limitations on a foster parent's rights and to avoid infringing on the constitutional rights of biological parents. Moreover, the statutory nature of

a foster parent's rights was reflected in the case law at the time such that the legislature, presumably, was aware that any rights of foster parents must be conferred by statute. See *In re Juvenile Appeal (Docket No. 10718)*, supra, 188 Conn. 261–62 ("foster parents have standing in any proceeding concerning the placement or revocation of commitment of a foster child . . . this standing does not spill over into a proceeding involving termination of parental rights" (citation omitted; footnote omitted)); see also *Eason* v. *Welfare Commissioner*, 171 Conn. 630, 633–35, 370 A.2d 1082 (1976) (concluding that foster parent "did not fall within one of those categories" of persons enumerated in General Statutes (Rev. to 1975) § 17-62 (f), "which restricts the right to file an application for revocation to a 'parent,' a 'relative' and other persons or agencies named therein"), cert. denied sub nom. *Eason* v. *Maloney*, 432 U.S. 907, 97 S. Ct. 2953, 53 L. Ed. 2d 1079 (1977).

Moreover, when it again amended the statute in 1998 to provide former foster parents with "standing to comment on the best interests of [the] child," the legislature was very specific about a foster parent's role. See Public Acts 1998, No. 98-185. During debate in the House of Representatives, Representative Mary Mushinsky, one of the bill's cosponsors, explained that the law "clarifies" that foster parents have "standing *for the limited purpose* of commenting on the child's best interest in a variety of Superior Court hearings." (Emphasis added.) 41 H.R. Proc., Pt. 7, 1998 Sess., pp. 2355–56. Mushinsky continued that, in response to complaints from the Children's Committee, the legislation provided foster parents with the ability "to express an opinion on their knowledge of the child after having cared for the child for an extended period. We believe [that] it will help keep good foster parents in the system." Id., 2356.

Similarly, Senator Adela M. Eads, another cosponsor of the bill, explained during debate in the Senate that

the amendment would provide rights to foster parents that they did not have under state law. See 41 S. Proc., Pt. 8, 1998 Sess., p. 2456. The senator detailed how "[t]his bill extends the right of foster parents by permitting them to comment on the best interests. And I want to emphasize *the best interests of the child* in any type of neglect hearings . . . even if the child is not living with [the foster parents currently] but has . . . lived with them [for] at least six months. There are an awful lot of times the children are taken [to] one foster home from [another], and the foster parents who have had these children *have not had the right or the authority* to be able to" give their opinion on a child's best interests. (Emphasis added; internal quotation marks omitted.) Id. Eads closed by, essentially, stating that foster parents should have a right to be heard and comment but no more, which "strikes a very good balance because it gives the [former foster parent] who has invested a great deal of love, and affection, with this child, and who knows this child better than any social worker or [department worker], to be able to have a say in the [placement] of the child. I would hope that the [Senate] would support it." Id., p. 2457.

Consequently, in 2001, the legislature was not writing on a blank slate when it further amended § 46b-129, as a long history of providing foster parents with specific and limited roles in neglect proceedings existed. When the legislature amended the statutory scheme in 2001 by replacing a foster parent's "standing" with the "right to be heard," it was not taking anything away from foster parents but, rather, was clarifying that a foster parent's role in neglect proceedings is limited to the right to be heard and comment on the best interest of the child. Public Acts 2001, No. 01-142, § 8. That statutory change reflects a continued intent on the part of the legislature to limit the role foster parents play in dispositional proceedings. Compare Black's Law Dictionary

(12th Ed. 2024) p. 1700 (defining "standing" as "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right based on the party's having a sufficient interest in a judiciable controversy") with *State* v. *Hoyt*, 47 Conn. 518, 535–36 (1880) (finding that criminal defendant's right to be heard under state constitution is "subject to regulation and limitation" so long as limitations are "reasonable"); see also *State* v. *Johnson*, 227 Conn. 534, 543, 630 A.2d 1059 (1993) ("[w]hen the legislature amends the language of a statute, it is presumed that it intended to change the meaning of the statute and to accomplish some purpose"). Although I find it difficult to get past the plain and unambiguous language of the 2001 amendment of § 46b-129, I agree with the majority that the legislative history "refutes the notion that the legislature had any intention" of changing the role that foster parents play in neglect proceedings; part II of the majority opinion; because the truth is that a foster parent's role, since 1977, has been limited by statute. For that reason, I believe that the Appellate Court properly concluded in *In re Ryan C.*, supra, 220 Conn. App. 507, that a nonrelative foster parent does not have standing to seek permissive intervention in the absence of express statutory authorization.[38] See id., 526–27.

---

[38] The majority contends that the decision in *Nye* v. *Marcus*, supra, 198 Conn. 138, "undercuts" my argument, but I submit that *Nye* supports it. Footnote 31 of the majority opinion. Even after the biological parents' parental rights in *Nye* had been terminated by consent, this court held that foster parents lack standing to seek habeas relief with respect to a foster child because "[foster parents] do not have a liberty interest and their emotional relationship with the child, which was acquired through the temporary foster placement, is too tenuous a basis to afford standing . . . ." *Nye* v. *Marcus*, supra, 144. In response, the legislature passed what is now codified as General Statutes § 52-466 (f) so as to give foster parents statutory standing to file a petition for a writ of habeas corpus. In my view, *Nye* illustrates the point that the majority misses—foster parents have no rights unless conferred by statute, as this court held in *Nye*, and there is no statute conferring standing on foster parents to permissively intervene in the disposition of a neglect petition, as the legislature conferred with § 52-466 (f) following *Nye*.

Appellate precedent following the 2001 amendment of § 46b-129 confirms that the legislature intended to continue to limit the participation of foster parents in child protection proceedings. See *Spiotti* v. *Wolcott*, 326 Conn. 190, 202, 163 A.3d 46 (2017) ("failure of the legislature to take corrective action . . . manifest[s] the legislature's acquiescence in our construction of a statute" (internal quotation marks omitted)). For example, in *In re Joshua S.*, supra, 127 Conn. App. 723, the child was placed in the custody of the foster parents, but, after several months, the AMC moved to modify the disposition of the neglect petition and to transfer guardianship of the child to the maternal great aunt. Id., 725–26. The foster parents in *In re Joshua S.* repeatedly moved for intervention, which the trial court had denied, in order to oppose the transfer of guardianship. Id., 726–27. The Appellate Court concluded that the foster parents "do not have a colorable claim to intervention as a matter of right" because "they lack a sufficient direct and substantial interest in the subject matter of the action." Id., 728–29. After noting that a foster parent's rights are "restricted by statute" and that, under General Statutes (Rev. to 2009) § 46b-129 (o), they "have a right . . . to receive notice and be heard in any proceeding concerning their foster child," the Appellate Court found that "neither this statute, nor any other statute, confers on foster parents a right to intervene in a proceeding related to their foster child. The statutory scheme provides to foster parents a limited and narrow set of rights regarding foster children," which the legislature has not disturbed. (Footnote omitted; internal quotation marks omitted.) Id., 730; see also *In re Nicholas B.*, Docket Nos. CP-08-017705-A and CP-08-017706-A, 2010 WL 2383779, *3 (Conn. Super. April 27, 2010) (reviewing legislative history of § 46b-129 and concluding that, "[i]n 2001, the legislature modified the law, which had extended legal standing to foster par-

ents, to a more limited right to be heard"). Because the legislature did not respond to decisions like *In re Joshua S.* by amending the statute to revert back to providing foster parents with standing, it tacitly confirmed that the limited nature of nonrelative foster parents' participation in child protection proceedings.

Moreover, the greater statutory scheme confirms that a trial court is not authorized to allow nonrelative foster parents to permissively intervene. The legislature provided specific and detailed restrictions, including with respect to time, regarding relative intervention under § 46b-129 (d). The specificity that the legislature used concerning the intervention of relatives throughout § 46b-129 is inconsistent with the majority's conclusion that, under the common law, a trial court is authorized to grant permissive intervention to nonrelative foster parents. In § 46b-129 (d), the legislature specifically provided for relative intervention and the guidelines that must be followed in order to properly intervene.

In doing so, the legislature contemplated that relative intervention could occur early in the neglect proceedings, as "any person related to the child or youth by blood or marriage," who has not previously been identified by the department, may seek to intervene within ninety days of the preliminary hearing on the order of temporary custody "for the limited purpose of moving for temporary custody of such child or youth." General Statutes § 46b-129 (d) (1) (A). The legislature essentially deprived the trial court of discretion in this regard by directing that, "[i]f a motion to intervene is timely filed, the [juvenile] court shall grant such motion except for good cause shown." General Statutes § 46b-129 (d) (1) (A). More than ninety days after the preliminary hearing, the legislature provided that "[a]ny person related to a child or youth may file a motion to intervene" for purposes of temporary custody. General Statutes § 46b-129 (d) (1) (B). At that point in time, however, relative

intervention is, generally, at the trial court's discretion. See General Statutes § 46b-129 (d) (1) (B).[39]

Moreover, the legislature specifically defined an intervening relative's role in the neglect proceedings. The statute provides that "[a] relative shall appear in person, with or without counsel, and shall not be entitled to court appointed counsel or the assignment of counsel . . . ." General Statutes § 46b-129 (d) (1) (C); see also General Statutes § 46b-129 (d) (5). Furthermore, the court "shall issue an order directing the [petitioner] to conduct an assessment" of the intervening relative and file a report within forty days. General Statutes § 46b-129 (d) (2). A hearing on the relative intervenor's motion for temporary custody must be held promptly, within fifteen days of the receipt of the assessment, and, if anyone objects to custody vesting in the intervening relative—including the GAL or AMC—the objecting party has the burden of proving "by a fair preponderance of the evidence that granting temporary custody of the child or youth to such relative would not be in the best interests of such child or youth." General Statutes § 46b-129 (d) (2).

The legislature also provided that a relative can intervene for purposes of seeking guardianship of the child. See, e.g., *In re Adelina A.*, 169 Conn. App. 111, 120–21, 148 A.3d 621 (noting that "[a] respondent parent, relatives, and former guardians can contest a child's placement at various stages in the [neglect] proceedings . . . [and] [s]imilarly, relatives can seek to become the child's temporary custodian or guardian by filing a motion to intervene" (citation omitted; footnotes omitted)), cert. denied, 323 Conn. 949, 169 A.3d 792 (2016).

---

[39] It is noteworthy that the intervening relative who is granted temporary custody is nonetheless expressly directed that, as a matter of court order, he or she "shall . . . cooperat[e] with the [petitioner] in the implementation of treatment and permanency plans and services for such child or youth." General Statutes § 46b-129 (d) (3).

A motion to intervene to seek guardianship must be filed "more than ninety days after the date of the preliminary hearing" and can be filed by "[a]ny person related to a child or youth . . . for purposes of seeking guardianship . . . ." General Statutes § 46b-129 (d) (4). The trial court has the discretion to grant a relative permission to intervene in order to seek guardianship, "except that such motion shall be granted absent good cause shown whenever the child's or youth's most recent placement has been disrupted or is about to be disrupted." General Statutes § 46b-129 (d) (4). The Appellate Court recently described intervention under that exception as "intervention . . . as of right . . . ." *In re Brian P.*, supra, 195 Conn. App. 591.

The legislature's level of detail regarding the specifics of a relative's intervention refutes the majority's contention that "subsection (d) [of § 46b-129] is concerned only with the expeditious placement of children with family members at the outset of proceedings under the statute . . . [and] does not provide a blanket revision or modification of the rules of permissive intervention in connection with neglect proceedings generally." Part II of the majority opinion. Subsection (d), instead, provides that a relative can file a motion to intervene for purposes of seeking guardianship at any time ninety days after the preliminary hearing, although there are provisions addressing the outset of proceedings. The majority provides no explanation as to why the legislature would include such a comprehensive and thorough scheme for the intervention of relatives but fail to provide for the intervention of nonrelative foster parents in any manner. See *BayBank Connecticut, N.A.* v. *Thumlert*, 222 Conn. 784, 790, 610 A.2d 658 (1992) ("[o]ur conclusion is further bolstered by the legislature's enactment of statutory guidelines that expressly regulate the procedure"); see also *Branford* v. *Santa Barbara*, supra, 294 Conn. 813 ("[w]e are bound to

interpret legislative intent by referring to what the legislative text contains, not by what it might have contained" (internal quotation marks omitted)).

"[I]t is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly . . . ." (Internal quotation marks omitted.) *Costanzo* v. *Plainfield*, supra, 344 Conn. 108. The legislature is presumed to know the law and presumed to intend to change the meaning of a statute by changing its language. See *Cagiva North America, Inc.* v. *Schenk*, 239 Conn. 1, 8, 680 A.2d 964 (1996) ("[t]here is a presumption that the legislature, in enacting a law, did so in view of existing relevant statutes and intended [the new enactment] to be read with them so as to make one consistent body of law" (internal quotation marks omitted)); see also *State* v. *Johnson*, supra, 227 Conn. 543. Here, in subsection (d) of § 46b-129, the legislature demonstrates that it knows how to convey its intent expressly as to whom may intervene in child protection proceeding by expressly authorizing related persons to intervene in a neglect petition. Because "[t]he rights of foster parents are defined and restricted by statute"; *Hunte* v. *Blumenthal*, supra, 238 Conn. 164; it seems illogical that the legislature would confer a statutory right to intervene for relative foster parents but, then, leave it to the juvenile court's general authority to grant permissive intervention for nonrelative foster parents.

I therefore would conclude, in light of the language employed in § 46b-129, its legislative history, and the surrounding statutory scheme, that a trial court may not authorize a nonrelative foster parent to seek permissive intervention in neglect proceedings. If the legislature had intended to provide nonrelative foster parents with the right to intervene in neglect petitions, then it would have done so, as it did with relative foster parents in subsection (d) of § 46b-129. That lack of statutory authorization, in my view, is dispositive, especially

within the statutory framework that implicates the fundamental rights of biological parents.[40] See *Seramonte Associates, LLC* v. *Hamden*, supra, 345 Conn. 86 (legislature's "use of . . . different terms . . . within the same statute suggests that [it] acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings" (internal quotation marks omitted)).

B

I now detail the contours of a foster parent's statutory right to be heard under § 46b-129 (p), which involves a substantial amount of discretion for the trial court. A trial court is best positioned "to determine the effect that a particular procedure will have on [the] parties." (Internal quotation marks omitted.) *State* v. *Jones*, 314 Conn. 410, 420, 102 A.3d 694 (2014); see also *Griswold* v. *Camputaro*, supra, 331 Conn. 709 ("the trial court has broad discretion in matters of case management"). Accordingly, it is best left to a trial court's discretion to decide how a foster parent should optimally exercise his or her right to be heard under subsection (p). The

---

[40] The majority opines that "[i]t is not evident to us that, by affording foster parents an automatic right to be heard in neglect proceedings [§ 46b-129 (p)] prohibits foster parents from seeking permissive intervenor status to participate as parties in those proceedings." Part II of the majority opinion. I respectfully disagree. As this court has often observed, "[w]e are bound to interpret legislative intent by referring to what the legislative text contains, not by what it might have contained." (Internal quotation marks omitted.) *Branford* v. *Santa Barbara*, supra, 294 Conn. 813. The legislature, in enacting and amending § 46b-129, specifically provided for the participation of nonrelative foster parents in child protection proceedings. If it had intended to permit permissive intervention by nonrelative foster parents, "it easily could have said so." *State* v. *Ortiz*, 217 Conn. 648, 654, 588 A.2d 127 (1991). Because "[t]he rights of foster parents are defined and restricted by statute" and foster parents "do not enjoy a liberty interest in the 'integrity of their family unit' "; *Hunte* v. *Blumenthal*, supra, 238 Conn. 164; I submit that there was no need for the legislature to "clearly and plainly" prohibit parents from seeking permissive intervenor status in neglect proceedings. *Vitanza* v. *Upjohn Co.*, 257 Conn. 365, 381, 778 A.2d 829 (2001).

trial court's discretion in this regard is supported by our case law. See, e.g., *In re Vincent D.*, supra, 65 Conn. App. 668 ("[w]e are persuaded that the court did not abuse its discretion in permitting foster parents to participate, to a limited degree, in the dispositional phase of proceedings to terminate the parental rights of the mother"); *In re Nicholas B.*, supra, 2010 WL 2384779, *4 ("A qualified foster parent and counsel, if applicable, may be present during the child protection proceeding. Sequestration orders may be entered at the court's discretion . . . ."). I therefore would conclude that, under § 46b-129 (p), foster parents are entitled to give a statement, which is either sworn or unsworn, in oral or written format, at a time that the trial court, in its discretion, deems most appropriate.

The right to be heard memorialized in § 46b-129 (p) does not, however, authorize foster parents to present or to cross-examine witnesses, or to present their own evidence. See id. ("At the close of evidence, the foster parent has the right to be heard and comment by making an unsworn statement to the court expressing her or his opinion regarding the best interest of the child, without being subject to [cross-examination]. . . . Section [46b-129 (p)] does not extend to the foster parent or counsel the right to offer evidence or [cross-examine] any witness or otherwise participate in the proceeding."). In sum, the right to be heard for foster parents under § 46b-129 (p) includes the right to make a statement with respect to the child's best interest at a time left to the discretion of the trial court.

The decision of the Appellate Court in *In re Vincent D.*, supra, 65 Conn. App. 658, illustrates the proper parameters of a foster parent's right to be heard so as to avoid comparisons with a biological parent. In that case, the trial court sequestered the foster parents but allowed them to "observe and to comment through counsel" on the proposed disposition of the termination

of parental rights petition. Id., 664. As the Appellate Court recounted, foster parents "have no right to intervene in the *adjudicatory* stage of a termination proceeding"; (emphasis in original) id., 665; but are allowed to intervene in the dispositional phase, as "the suitability and circumstances of [the prospective] adoptive parents . . . [may] be considered." (Internal quotation marks omitted.) Id., 666. A foster parent's input is welcomed during the dispositional phase is because "persons with significant knowledge of and experience with the child" should be encouraged to "[assist with] the court's determination of the placement that protects the best interest of the child." Id. The foster parent in *In re Vincent D.* was therefore properly allowed "to participate, to a limited degree, in the dispositional phase of proceedings"; id., 668; though the foster parent's counsel was "precluded" from calling or questioning witnesses. Id., 664. This limited, but useful, participation ensures that a foster parent's "significant knowledge of and experience with the child" can aid the court in determining the child's best interest without overly delaying the child protection proceedings. Id., 666.

Given my interpretation of the "right to be heard" under § 46b-129 (p), I would conclude that Judge Daniels did not abuse his discretion when he allowed the foster parents to give an unsworn statement at the beginning of the November 4, 2024 hearing on the petitioner's motion to open and modify the disposition. The foster parents, speaking through their attorney, Rachel Levine, sought to have the foster parents present for the entire hearing and, then, give a "sworn statement, through the testimony of [the foster father] . . . ." Levine argued that the foster parents needed to be present during the hearing because they had "extremely limited information," but Judge Daniels disagreed. The court found that representation was "not entirely accu-

rate," as the court had given the foster parents notice of the motion and, furthermore, they had been provided with the revocation study. Judge Daniels reasoned that the foster parents would "[c]ertainly" be able to comment on the best interest of Jewelyette on the basis of the foregoing.[41]

The trial court provided the parties with an opportunity to respond. The respondent's counsel argued that the foster parents' request "is just further indication [of] the bad faith of which the [foster parents] have conducted themselves" and asserted that it was "an attempt for further delay" and "to further manipulate this child . . . . I am shocked that we are literally dealing with this." The GAL agreed that the foster parents involvement is "prolonging everything" and objected to them being present throughout the hearing. Deetta Roncone-Gondek, Jewelyette's attorney, characterized both the respondent's and the foster parents' counsel as "attempt[ing] to set up yet another appealable issue" and, as the majority appropriately highlights, added that this case "has become less about Jewelyette and more about the adults in the room getting to decide. . . . It's not about Jewelyette anymore . . . ." The trial court, agreeing with Roncone-Gondek's sentiments, allowed the foster parents to make a statement through Levine before the hearing began.

The court's decision to do so was well within its discretion under § 46b-129 (p), as Judge Daniels allowed the foster parents an opportunity to be heard and to comment on the best interest of the child, albeit briefly. Although the court did not allow the foster parents to attend those proceedings, to call their own witnesses, or to present their own evidence, the trial court was not

---

[41] Judge Daniels repeatedly noted how the foster parents' pending appeal injected uncertainty into the proceedings but that his decision would be "based upon the law as it exists [that day]."

obligated to do so under the statutory scheme carefully crafted by the legislature. Rather, given the foster parents' involvement in the previous proceedings, the court was well-informed of their concerns, such that allowing them to provide a brief statement at the beginning of the hearing both advanced judicial economy and adequately protected the foster parents' statutory "right to be heard and comment . . . ." General Statutes § 46b-129 (p). In light of the foregoing, I would conclude that the trial court did not abuse its discretion when it allowed the foster parents to give a brief statement at the start of the November 4, 2024 hearing. I therefore would deny the foster parents' writ of error.

For the foregoing reasons, I respectfully dissent.